JOSHUA RAWNSLEY and ANDREW BARRICKLO *vs.* THE TRENTON MUTUAL LIFE INSURANCE CO.

1. The powers conferred upon this court by the act to prevent frauds by incorporated companies, are *extraordinary* powers, and are to be exercised with caution, and only when the circumstances of the case and the ends of justice require it.

2. Nor is the Chancellor bound, as a matter of course, to issue the injunction, although it is made satisfactorily to appear *that the company is insolvent;* but he must exercise his best discretion and exert the powers conferred for the safety of the public and the advantage of the stockholders and creditors.

3. The bill or petition must set forth the facts and circumstances of the case. Affidavits and proofs may be read, but for no purpose except to sustain the case made by the bill, and by the opposite party in its disproof and denial.

4. It will not do to simply charge that the company is insolvent, and then take affidavits to show facts and circumstances not alluded to in the bill, to make out such insolvency.

5. Motion to restrain and enjoin refused, where the case made by the pleadings and the proof corresponding therewith, did not justify the court in declaring the company insolvent, and subjecting it to the provisions of the act to prevent frauds by incorporated companies.

This was a proceeding under the "Act to prevent frauds by incorporated companies." The bill was filed by a creditor and a stockholder of the company, and the complainants now applied for an injunction to restrain the defendants from exercising their corporate franchises, and for the appointment of receivers to wind up its concerns.

*Messrs. Beasley* and *Halsted.* for application.

*Dayton* and *Vroom, contra.*

THE CHANCELLOR. This bill is filed by Joshua Rawnsley, a policy-holder, and as such, by virtue of its charter, a member of "The Trenton Mutual Life and Fire Insurance Company," and by Andrew Barricklo, who alleges himself to be a creditor of the said company.

The proceedings are under the act entitled "An act to prevent frauds by incorporated companies," and I am asked

now to declare this company insolvent, and to appoint receivers to wind up its concerns.

By virtue of the general equity powers of the court, this bill could not be maintained. The relief sought for is under and by virtue of the statute which must guide the court in its decision of the case.

The court is authorized by the act, whenever an incorporated company has become insolvent, by petition or bill, exhibited by a creditor or stockholder, setting forth the facts and circumstances of the case, to hear the matter in a summary way, upon the affidavits, proofs and allegations by or on behalf of the parties. If, upon such inquiry, it shall be made to appear that the said company has become insolvent, it shall be lawful for the Chancellor to restrain the company and its officers, by injunction, from exercising the privileges and franchises granted, and if the circumstances of the case, and the ends of justice require it, to appoint receivers, &c.

The powers conferred upon the court are extraordinary powers, and are to be exercised with caution, and only when the circumstances of the case and the ends of justice require it.

Where a creditor or stockholder comes into court under this act, it is not his particular grievance the court is to redress, or his individual interest that is to be protected; but the very object of the act is to protect the public at large from imposition, and to promote and secure the general interest of the stockholders and creditors.

Nor is the court bound, as a matter of course, to issue the injunction, though it is made satisfactorily to appear that the company is insolvent. The Chancellor must exercise his best discretion, and exert the powers conferred, for the safety of the public and the advantage of the stockholders and creditors.

Nor has the Chancellor any right to act in the premises except on the case made before him. The bill or petition, the act expressly says, must set forth the facts and circumstances of the case.

Affidavits and proofs may be read, but for no purpose ex-

cept to sustain the case made by the bill, and by the opposite party in its disproof and denial. It will not do simply to charge that the company is insolvent, and then take affidavits to show facts and circumstances not alluded to in the bill, to make out such insolvency. It is no trifling matter for the court, where the legislature have incorporated a company with extensive powers, by the exercise of which a large amount of capital has become employed, and in which thousands of our citizens have become interested and their property involved, to strip it in a summary way of all its franchises and privileges, and determine the rights of individuals connected with it. It is a case where the court is to exercise great caution; and I think I may safely say, where a single stockholder, together with a creditor of the company, files a bill under this act, if the bill, taking all the facts and circumstances stated as true, will not justify the issuing of an injunction; no affidavits, or proofs, respecting collateral matters, though they tend to prove the company insolvent, will justify the court in granting the prayer of the bill. The complainant may amend his bill, and make a case upon which the court can act. But it would be in violation of the well-established practice of this court, and I think unjust, for the court to exercise the powers conferred by this act of the legislature, unless the facts and circumstances of the case, as set out in the bill, will warrant it. It is a summary proceeding, and, in its nature and effect, a final hearing upon its merits. By every principle of practice and pleading, the proofs must be pertinent to the issue: *secundum allegata.*

It is very proper in a case of this kind, when there has been any fraudulent conduct on the part of the directors or agents of the company, any misapplication of funds or violation of trust, to set out such acts and violations of duty in the bill, not because the court can, upon any or all of these grounds, grant the relief contemplated by the act, but because they have a bearing upon the question at issue, and give point and strength to the circumstances relied upon to make out the insolvency of the company.

But it is not competent, where there are no corresponding charges in the bill, to impugn, by affidavits, the character or conduct of the directors or agents of the company, and make a case upon which the court is to act, not even alluded to in the bill of complaint.

These remarks are made because they have a direct bearing upon the case in hand.

This company was incorporated by an act of the 5th of February, 1847, and the privileges and franchises conferred upon it may be summed up in a few words. It has power to insure lives, and to make all and every insurance appertaining to or connected with life risks, of whatever kind or nature, and also to insure all kinds of property, both real and personal, against loss or damage by fire. And the act would seem to confer power enough to devise and contrive, at the discretion of the directors, any and all schemes to insure life risks, and against fire, and to any extent the public might see fit to embark in the risk. There are no restrictions in the charter, except that the company is subject to those contained in the act entitled "An act concerning corporations," and which, in this case, amounts to little or nothing in limiting the discretion of the directors in the exercise of the powers conferred by the charter.

By the second section of the act, it is declared that all persons insured in the association, while they so continue, shall be deemed and taken as members thereof.

Joshua Rawnsley, one of the complainants, effected an insurance on his house in the city of Trenton for the sum of $3000, for which he paid $12 cash, and gave his premium note for $120, on which the $12 was credited.

Andrew Barricklo, the other complainant, had an insurance upon his store goods to the amount of $3000. His goods were destroyed by fire, and he claims to be a creditor to the amount of this insurance.

Do these complainants make out a case by their bill, to justify the court in declaring the company insolvent?

The bill charges distinctly that the company is insolvent.

But what are the facts and circumstances stated to sustain the charge?

Let us look first at the general, and then at the specific allegations.

It is charged "that the said the Trenton Mutual Life and Fire Insurance Company, on or about the 21st day of April, 1852, stopped payment, and stopped carrying on the business of insurance, and have neglected and refused to pay their losses for want of funds, when the same were presented for that purpose; and neglect and refuse to pay their just debts when demanded within the usual hours of business; and have suspended from the time last mentioned the ordinary business of the said company for want of funds to carry on their business."

Now, I may remark generally, it was never in contemplation of the legislature, that this company should transact business with the promptness and punctuality of a bank, and should, during what are called business hours, meet any pecuniary demand against them at the moment it should be made at their counter. So far from it being contemplated that they should at all times have funds on hand to meet demands against them, it is in express terms provided by their charter, that "if at any time it shall so happen that there shall be just claims on the corporation for losses sustained, to a greater amount than they have funds on hand to discharge, in such cases the directors, for the time being, shall, with all convenient expedition, proceed to assess such deficiency, in a ratable proportion, on the members of the association."

The allegations referred to are very pertinent where the bill is exhibited against a bank.

It is an evidence of insolvency for a bank to refuse to transact business during the usual hours, and a refusal to redeem their bills, pay deposits and meet the calls upon them promptly, are, from the nature of their business, strong evidences of insolvency.

But in this case the complainants stop short of making out a case that could be required even against a bank. What

evidence is there, either in the bill or *aliunde*, that this company have stopped payment, or stopped carrying on their business, or have refused to pay any just debt for want of funds, or have ever, for any reason whatever, refused to pay a just debt?

To meet these general allegations, the only specific instance referred to is that of Mr. Barricklo, the complainant. His loss occurred in November, 1850. He says that they neglected and refused to pay him, and that he has commenced a suit against the company. But he does not state that they refused to pay him for *want of funds;* and it appears that the reason why they did not pay was not because they had not the funds, but because there was a dispute, and which the company deemed well founded, as to the justness of Mr. Barricklo's claim.

There is not, in the whole bill, another instance stated where the company have ever refused to meet their liabilities, and not an instance where they have neglected to meet all the demands against them during business hours.

Nor is there anything in the proofs or affidavits to show that this company have ever in any case refused or neglected to pay just demands against them. The great effort which was made to show that it was for want of funds they hesitated for so long a time to pay the life risk which was placed in the hands of Mr. Halsted for collection, would seem strongly to indicate that whatever may be the actual condition of the company, they have, thus far, fulfilled their engagements in paying to the policy-holders their amount of losses sustained by fire.

By every principle of law and equity, in absence of all proof to the contrary, they are entitled to the benefit of this conclusion, when it was of such importance to the success of the complainants to make out a default in this respect. Indeed, it is a matter of surprise that in an investigation of the charge of insolvency against the company which has been doing such extensive business, and where so much money has been paid out for losses, so little could be

found to make out any delinquency in meeting promptly their pecuniary engagements.

That they have stopped carrying on the business of insurance, is no evidence whatever of their insolvency ; and this charge is in strange contrast with the ground stated in the next paragraph of the bill for asking the interference of the court, that the policy-holders being liable to make up losses to the amount of their premium notes, the liability of the complainant, Joshua Rawnsley, as well as that of all the other policy-holders, will continue to increase, if the said company should continue to carry on their business of insuring. That they have stopped insuring, and are husbanding their resources to meet their recent heavy losses, is a circumstance much more to the credit of the directors, than a cause of censure against them, and the safety of the public, as well as the interest of the stockholders, demanded such a course. It is the very protection and relief which would be afforded by granting the prayer of this bill.

But let us examine other facts stated in the bill as the foundation for the interference of the court. Perhaps it will be most satisfactory to take them up in the order they are stated.

After setting out the charter and several of the by-laws, the bill alleges that the company established agencies in New York and Philadelphia; that, by the laws of the State of New York, it became necessary that they should furnish proof of the amount of capital, and of the manner in which the same was invested ; that, under pretence of complying with the laws of New York, they created what was called their guaranty capital.

There are several particulars alleged as to this guaranty capital, for the purpose of showing the improper manner in which the directors have acted in administering the affairs of the company.

Among others, the insufficiency of the securities taken to constitute this capital—the utter unavailability of the capital itself for the purposes for which it was created—that a large

part of this capital was withdrawn while the agents of the company continued to effect insurances upon the representation that the whole capital still existed—that the act of the directors in constituting this capital was illegal, and that they have misappropriated money in paying interest upon it.

There is no charge in the bill that any officer or agent of the company has been benefited, directly or indirectly, by the creation or the use of this capital, or that it was not created in good faith, and for the purpose of promoting the general interest of the stockholders. The complainants themselves make an exhibit among their proofs, by which it appears that the affairs of the company were investigated by a committee of the legislature, and that, in their report dated Feb. 6th, 1850, they particularly mention this guaranty capital, and the causes which induced the directors to create it, and the terms upon which it was secured, to wit, the payment of six per cent. per annum, to those who furnished it. The report states : " The committee have carefully examined the bonds and securities composing the guaranty capital, and find them to be absolute money bonds, with collaterals ; and while they have full confidence in the responsibility of many of the names attached to the bonds, they are not sufficiently acquainted with the value of the real estate and other securities found as collateral, to express, from personal knowledge, an opinion with regard to their value."

But the committee furnish the certificate of the then mayor of the city of Trenton, certifying that he had examined these securities ; that they were good, and possessed an actual value of one hundred and fifty thousand dollars. After the use of this capital for two years or more, and its having been brought to the knowledge of the legislature, who had instituted an inquiry by committee, for the very object of ascertaining whether this company was conducting its business according to law, and the terms of its charter, and no disapprobation expressed by them with the creation or use of this capital, I should be going too far to determine upon the facts and issue before me, that this guaranty capital was illegal, and that the individuals furnishing it had

incurred no pecuniary liability.   There are too many policy-holders having a deep interest in this question, for me to decide upon their rights in this collateral and unsatisfactory manner.   And I do not think it proper that I should intimate an opinion which may in any way impair the rights of a large portion of the community which this question affects. It is not necessary that I should do so, in order to decide the question now at issue.

It appears that a large amount of money has been paid for interest on this capital.   But it is not charged that it was corruptly paid, or that any director, officer or agent of the company, directly or indirectly, participated in any benefit derived from it.   If any error has been committed in reference to the creation and use of this capital, it is not pretended by the bill that it was anything more than an error of judgment.

The bill then refers to the report of the committee of the legislature in 1850, and to an advertisement made by the company in the *State Gazette*, on the 27th of January, 1851. But it appears by this report that at that time the company was solvent, and in the advertisement referred to, the assets of the company are stated at upwards of two hundred thousand dollars.   The very object of this advertisement was to show the solvency and safety of the company as an insurance company.   There is no allegation by the complainants that these statements made by and on behalf of the company, were not strictly true; and how they go to show the insolvency of the company then, or now, or what bearing they have on that question, was not stated in the argument, and I have been unable to conceive. If the bill had proceeded to allege that those statements were false and made to impose on the public, and did not represent the true condition of the company at the time, or that since they were made, the large amount of funds then on hand had been abstracted improperly, and squandered, there would have been some virtue in setting out these matters.

I have now referred to all the facts of the bill except one, and that is the declarations made by the president at

a meeting of the policy-holders, in reference to the condition of the company.

As these declarations appear to me to be the only real foundation for this proceeding, and probably the cause of this suit being instituted, I will quote the language of the bill respecting them : "That it appears by the statement of the president of the company, made at a public meeting of the members of the said company, and in the presence of several of the directors of the said company, that up to the spring of the year 1851 the company was in a prosperous condition ; that they had a surplus over everything ; that a series of losses followed ; that the news arrived of a loss of twenty thousand dollars ; it was astounding—it was regarded as a death blow.  The question then was, can we go on ?  could we take the money of any man, when we thought there were doubts about being able to pay his loss ?  As honest men we could not do so ; and we resolved to take no more risks ; we issued circulars to our agents to issue no more policies."

It is evident that in these declarations there is nothing to show the company insolvent.  They had met with a heavy loss of twenty thousand dollars.  There was no doubt expressed as to the ability of the company to meet the loss already incurred.  The determination to take no more risks was because the funds of the company were so far exhausted as to render the insurance of the persons insured insecure.  Further losses might make the company insolvent. But the company had met all the losses already sustained, and the fact that their resources were such, that if any further losses occurred the company would not be able to meet them, induced the directors to determine wisely, that they ought not, and would not take any more risks.

But the bill alleges further, "that the said president, at the said public meeting of the members of the said company, advised gentlemen to get insured elsewhere than in the said company, and to get their policies canceled.  And upon being inquired of whether he considered the policies in said company good, he replied no ; and being asked

whether the whole amount of premium notes would pay the losses, the said president answered no. He further said that the losses were forty-five thousand dollars, and the premium notes twenty thousand dollars, and that these losses all occurred in the last six months."

It is not pretended, and cannot be with any plausibility, that the test of the insolvency of this company is, whether they have funds or resources enough to meet all the *risks* they have *taken*, or indeed any considerable portion of them. The question is, have they paid, or are they able to pay, all legal demands made upon them for losses that have actually been sustained ? There is no capital provided by the charter to which the insured is to look for a remuneration in the event of a loss, except that which is furnished by the insured themselves as a premium for their policies. The first insured had nothing to look to but the premium he had himself paid ; and the very principles upon which the company is established, exclude the idea of a capital sufficient to pay the whole amount for which insurances had been effected, if every risk should prove a loss.

It appears from the evidence furnished by the complainants, as to these allegations of the bill respecting the statements made by the president, that they were made at a public meeting of the policy-holders ; that the president then and there invited inquiry ; that he answered fully and frankly all questions propounded. The bill does not allege that his statements were incorrect, disingenuous or unsatisfactory. It does not pretend that he said the company was insolvent, or that they had not funds amply sufficient to meet all their losses. I am unable to discover that he stated any fact which goes to show the company insolvent. His statement that the losses were forty-five thousand dollars and the premium notes twenty thousand dollars, only shows that the premium notes are not sufficient to pay the losses. That may well be, and yet the company have funds enough besides the premium notes to pay double the amount. If such were the fact, or there were any plausible grounds for suspicion that the only fund or resources to meet the

losses, were the premium notes, why did not the bill so charge?

It appears, from other parts of the bill, that the company, from time to time, had large sums of money invested, and there is no charge nor intimation that they have not now resources enough to meet their losses, independent of the premium notes. There is another fund provided by the charter, and to which no allusion is made in the bill, and that is the "one per cent. on the principal sum mentioned in each policy." It was urged in argument that this fund amounted to nothing, for two reasons. First. Because of the expense of collecting it; and, Second. Because a large number of the policies were effected upon misrepresentation, and payment cannot be enforced on that account.

As to the objection of the non-availability of the capital, it may be answered that this mode of furnishing funds being provided by the wisdom of the legislature in the charter itself, it would hardly answer for this court to declare in advance its inadequacy from the mode of its existence. And as to its being void for fraud, there is not the slightest foundation for the charge from anything alleged in the bill.

The president, in the affidavit which he puts in on behalf of the defendants, after some explanations of the real situation of the company, says "the amount of the premium notes and one per cent. on the amount insured, and for which the insured are liable under their charter, makes an amount much more than sufficient to pay and satisfy all the just liabilities of the said company." If that is true, this court is not authorized to grant an injunction or appoint a receiver, and there is nothing in the bill, or in the evidence taken, to contradict this statement. There is not a charge of corruption or fraud against these directors, nor one from which fraud should be inferred. This company may be insolvent, and the directors may have acted with all the indiscretion and fraud with which they were charged in the argument, but I must decide this case as it is made by the pleadings, and I cannot give weight to allegations of coun-

sel, or to statements under oath, of matters which have no correspondence with the charges contained in the bill.

It was said, in argument, that this affidavit of the president should be governed by the same rules as an answer, and that the allegations in the bill, not responded to by the affidavit, should be taken as true. Admitting this as so, the affidavit does respond to every fact in the bill which bears' upon the question in issue, to wit, the insolvency of the company ; and if that affidavit is true, this company is not insolvent.

Among other things, it was insisted in argument that the refusal of the company to produce their books, upon notice, before the master, and the refusal of the president and officers to be sworn when called on as witnesses, should be considered by the court as strong evidences of insolvency.

Without intimating any opinion as to the correctness of the advice of counsel, by which the company and its officers were governed in these respects, I will only say that, in a case of doubt, these matters might be urged with force. But giving to them all the consideration to which they are entitled, without other facts to warrant it, they are insufficient, in my judgment, to authorize the interference of the court.

In conclusion, I would remark that if one-half of the charges made in argument against the managers of this company, and as to its condition, were before me in a proper shape, I would not hesitate to take its management out of the hands of the directors.

If the directors have been guilty of the fraud and corruption, and the concerns of this company are in the hopeless condition represented by counsel, why was not such a case made by the bill ? If this guaranty capital is all fictitious, and was concocted for private speculation—if certain officers and directors of the company have been receiving interest on worthless bonds and mortgages—if unnecessary and exhorbitant sums have been paid for salaries of officers, and for agencies, and in other ways squandered —if insurances, in and out of this state, to the amount of

several millions, have been effected upon gross false misrepresentations—if the funds of the company have been illegally abstracted, and the guaranty capital and premium notes spirited away, why has not such a case been made and presented to this court by the complainants in their pleading? If such a state of things exists, it is no fault of the law, or of this court, that the remedy is not applied. But I cannot act upon my own suspicions, nor upon public rumor or public excitement. It would be unwise, and in violation of individual rights, for me to do so; and should it turn out that such suspicions and rumors and excitement were not well founded, I should have inflicted an injury which I could not repair.

There is one important consideration which would prevent me from interfering with this company by the appointment of receivers, except in a very plain case, and one of pressing necessity.

It is manifest that the policy-holders who have sustained losses must look for their remuneration to the assessment provided for by the charter—the premium notes—and the one per cent. on the policies of the insured. This must necessarily, from the extensive business transacted by the company, produce a large fund. From the nature of the contracts with the policy-holders, can this assessment be made by any one except by the directors? Could it be legally made by receivers appointed by the court? At best, these are doubtful questions; and the action of the court, asked by this bill, may work the total destruction of this whole fund.

These directors are the trustees appointed by the stockholders and policy-holders to protect their interests. Upon the application of a single policy-holder, charging no breach of trust, or any unfaithfulness on the part of their directors, I could not justify myself in putting in jeopardy the fund to which the insured look for a remuneration of the losses they have already, or may hereafter, sustain.

I have examined this case with care, and commenced the investigation with feelings strongly predisposed to grant the prayer of the bill. It is my conviction, not

Rawnsley et al. v. Trenton Mut. Life Ins. Co.

only that it is not a doubtful case, but that there is not the slightest ground afforded to justify me in declaring this company insolvent, and subjecting it to the provisions of the act to prevent frauds by incorporated companies.

Nothing that I have said can be construed into an approval by this court, as to the manner in which the affairs of this company have been conducted.

My opinion is founded, and my conclusion reached, upon the case made by the pleadings, and the proofs corresponding therewith.

The injunction is denied.