JOSHUA RAWNSLEY and ANDREW BARRICKLO *v.* THE TRENTON MUTUAL LIFE AND FIRE INSURANCE COMPANY.

1. Where it is manifest from the answer that an incorporated company is largely in debt, and has no available means or credit to enable it to meet its engagements, it is the plain duty of the court, and one of the leading objects of " the act to prevent frauds by incorporated companies," to secure to the creditors of the insolvent company an equal distribution of its assets.

2. Under such circumstances, the company will be declared insolvent, and the court will apply to it such provisions of the act as it shall deem advisable for the best interest of all concerned. But it does not follow that receivers should be appointed.

3. The application refused where neither the protection of the public nor the interest of the creditors or stockholders required it. See *Oakley* v. *The Paterson Bank,* 1 *Gr. Ch. R.* 178.

This was a bill for injunction and receivers, under " the act to prevent frauds by incorporated companies." The original bill was filed May 11th, 1852. The case was argued, and the application refused, May Term, 1852. (*Stn. Ch. R.* 95.) The complainants filed an amended bill July 13th, 1852. The cause was heard on the pleadings and proofs.

*Messrs. Beasley* and *Halsted,* for complainants.

*Messrs. Dayton* and *Vroom,* for defendants.

THE CHANCELLOR. By the act entitled " An Act to Prevent Frauds by Incorporated Companies," it is declared that if, after hearing the proofs and allegations of the parties, and upon inquiry into the matters or cause of complaint, it shall appear to the Chancellor that the said company has become insolvent, and shall not be about to resume its business in a short time thereafter, with safety to the public and advantage to the stockholders, it shall and may be lawful for the Chancellor to issue an injunction.

It is manifest, from the answer of the defendants, that this company is largely in debt, and has no available means nor

credit to enable it to meet its engagements. Its ability to pay depends upon the ability of others, who are its debtors. These debtors refuse to pay, and insist they are not legally bound to do so. So that this company is, at present, deprived of all the means to which the charter seems to look as the available fund to meet its engagements. Let us examine the answer, to ascertain the actual pecuniary condition of this company.

It does not appear by the answer, but the contrary is fairly to be inferred from its statements, that there is, at this time, one dollar in the treasury of the company, to meet its engagements. Its liabilities are large. Its creditors have resorted to the law, and brought suits against it. Judgments are obtained, and the company has had recourse to the premium notes, and to an assessment upon the policies. The amounts of the premium notes, and the policy assessment, are large enough to pay the debts. But these debtors refuse to pay, and the answer states that this failure on the part of the members to fulfill their engagements has brought them into difficulty, and, until removed, will render the company unable to pay its losses. The ability of the company to meet its demands depends upon the ability of its debtors, who are now resisting the demands made against them, on the ground that, at law, they are not legally liable. This company, then, presents the unpromising aspect of being largely in debt—of depending upon a large number of debtors for its ability to meet its liabilities ; these debtors, scattered in all parts of the country, each indebted in small amounts, and, in a body, making one common cause of resistance against the claims made upon them by the company. It is now more than a year since these embarrassments came upon the company, and since it was ascertained that it would be necessary to look to the premium notes, and the assessment against the policy-holders for relief ; yet it does not appear that the company has been able to collect a dollar from either of these sources. It is evident the company cannot resume its business in a short time with safety to the public and advantage to the stockholders.

It may be that the company will ultimately pay its debts; for, if the premium notes and assessment should fail, the guarranty capital will, in all probability, be sufficient to discharge the liabilities. But this guarranty constitutes a fund not provided by the charter. It is insisted that it can only be resorted to after the other resources of the company have failed and are exhausted. It is manifest, from the whole case, that this capital ought not to be looked upon as a fund *in hand*, which can be turned to account at any moment. It is not for me to decide now, when, or in what manner, or to what extent, this capital can be resorted to. This company is now embarrassed—it cannot meet its engagements—the fund to which its charter gives it recourse, under such circumstances, is withheld—it has not a dollar at its command.

What is the plain duty of the court, under such a state of things? One of the leading objects of the " act to prevent frauds by incorporated companies," is to secure to the creditors of the insolvent company an equal distribution of its assets. Suppose the court withdraws its hand from this company, what will be the consequence? It will go on and prefer such creditors as it may select, and ultimately, if not successful in collecting its debts, its other creditors must be the losers. Situated as this company is, have not its creditors a right to the protection of the court, in securing to them an equal distribution of its assets?

It is further manifest, from the facts before me, that this company ought not to be permitted, under its present embarrassments, to resume its business of insuring. It is true, it appears that it is not the intention of the present directors to do so. But they may change their minds, or the present directors may be displaced by others. The safety of the public, as well as the interest of the stockholders, demand the security which this court only can give them, and which the legislature has provided.

For the purpose of subjecting the company to the salutary provisions of the statute, I feel bound to declare the company, in the contemplation of the act referred to, insolvent, and to apply to it such provisions of that act as I may deem

advisable, for the best interest of all concerned. But it does not follow that receivers should be appointed. The act declares that it shall and may be lawful for the Court of Chancery, *if the circumstances of the case and the ends of justice require it*, at the time of ordering the injunction, to appoint a receiver or receivers.

It does not follow that because an injunction is granted, receivers should be appointed. In 1 *Green's Ch. R.* 178, *Oakly* v. *The Paterson Bank*, Chancellor Pennington says, "I am now moved, under the 8th section of the aforesaid act, to appoint receivers to take charge of the effects, and wind up the concerns of the bank. This I am authorized to do, 'if the circumstances of the case and the ends of justice require it.' This authority is a delicate one to be exercised. * * * * * * The effect of appointing receivers is to take the property out of the hands and control of those persons to whom the stockholders * * * * * have confided it. After the best reflection in my power to bestow on the subject, I have come to the conclusion that receivers ought not to be appointed. It by no means follows that because an injunction is granted, receivers should be appointed. They are independent questions."

The protection of the public does not require that in this case receivers should be appointed ; nor is this course necessary for the interest either of the creditors or stockholders. On the contrary, it appears to me that no one, a stranger to the extensive business of the company, can advantageously wind up its concerns. Some of the directors have a deep interest to see that the debts of the company are diligently and expeditiously collected. Self-interest will prompt them to energetic measures in closing its affairs.

The management being left in the hands of the directors, they will hereafter act under the immediate control and direction of the court. They will be enjoined from exercising any of the franchises of the company, except so far as may be necessary, in the most expeditious and economical manner, to collect its dues and pay its debts. They will be required from time to time to make such report as will

keep the Chancellor advised of the condition of the company, and accomplish the ends contemplated by the act of the legislature.

It was urged as a strong objection against leaving the directors in the management, that they, or some of them, had been guilty of gross frauds. If there was any evidence of this, it would be a sufficient reason for their immediate removal. But I feel bound to say that, after a very careful examination of the answer put in by the president and treasurer, that any charge of fraud made by the bill has been fully and fairly met. There may have been indiscretion on the part of the directors, but there is nothing in this case, taking the explanations of the answer, to justify the charge of fraud. The withdrawal of a part of the guaranty capital is satisfactorily explained. As to the remuneration received by those who furnished this capital, it has proved a very inadequate premium for the risk they ran. The individuals whose obligations the company now hold for fifty thousand dollars, it is not pretended are, any of them, irresponsible for the amount of their respective engagements. This capital has increased the security of the creditors of the company; and, as far as the stockholders were concerned, they made no objection to this mode of the company's increasing their business, until misfortune overtook the company.

Nor do I consider that it is any objection to the present directors continuing in the management, because the interest of the policy-holders and of the individuals who are liable for the guaranty capital is antagonistical. The policy-holders will resist the payment of their premium notes and assessments, as well in the hands of a receiver of this court as of the directors. They can make their defence, if they have any, as well in one case as the other. That they will be prosecuted with more perseverance by the directors, is a strong argument why the directors should not be disturbed. That there is a question between these conflicting interests as to which is primarily liable, is no reason why the directors should be displaced. That question will, in proper time, be settled by this court. As soon as the debts due the com-

pany are collected, and the directors make their report of assets on hand and available, and the debts of the company are ascertained, there will be a distribution of the fund among the creditors, so that in this way the issue must be made as to how, and under what circumstances the guaranty capital is to be made liable.

I shall, therefore, make an order declaring the company insolvent, under the act entitled " An act to prevent frauds by incorporated companies ;" and I shall make a further order that the directors lay before the court, on or before the first day of September next, under the oath of the president and treasurer, " a full and complete inventory of all the estate, property, and effects of the company ; its nature and probable value, and an account of all the debts due from the said company, and of the debts due to it ; " and also to make report of their proceedings to the court every six months thereafter. These are the duties required of receivers under the 11th section of the act referred to.

It will be in the power of the court, at any time hereafter, whenever the circumstances of the case and the ends of justice require it, to appoint a receiver under the provisions of the act ; and whenever any such collision shall occur between such of the directors as are guarantors of the guaranty stock, and the policy-holders, or the individuals who have given premium notes, as to render the discharge of the duties imposed upon the directors by the court incompatible with the rights of others interested in the company, it will be time enough for the court to interpose. I do not apprehend any such collision.

CITED *in Nichols* v. *Perry Patent Arms Co.,* 3 *Stockt.* 127 ; *Barriclo* v. *Trenton Mut. Life & Fire Ins. Co.,* 2 *Beas.* 156; *Street* v. *Citizens' Fire Ins. Co.,* 2 *Stew.* 26 ; *Street* v. *Citizens' Fire Ins. Co.,* 2 *Stew.* 29.