THE ATLANTIC TRUST COMPANY

*v.*

THE CONSOLIDATED ELECTRIC STORAGE COMPANY.

1. On an application to appoint a receiver to wind up an insolvent corporation, insolvency is the jurisdictional fact, and until it is satisfactorily proved the court can neither grant an injunction nor appoint a receiver.

2. In cases where the court derives its power from the existence of a particular fact, the party asking the court to exert its power must prove such fact by clear and convincing evidence, for until it is established the court has no power.

3. A bill which simply alleges that a corporation has become insolvent and has suspended its business for want of funds to carry on the same, is fatally defective. To be sufficient it must allege such facts and circumstances as will make it appear that its assets are insufficient to pay its liabilities; in other words, that it is insolvent.

4. Mere proof of insolvency will not, in all cases and under all circumstances, make it the duty of the court to appoint a receiver. It must, in addition, be made to appear, according to the requirement of the statute, that the corporation will not be able in a short time to resume its business with safety to the public and advantage to its stockholders

5. Where insolvency is proved, but it is also made to appear that the managers of the corporation are honest and capable, and that they are striving to the best of their ability, with a fair prospect of success, to relieve it from its embarrassment and put it in a condition where it may carry on its business

Atlantic Trust Co. *v.* Consolidated Electric Storage Co.

·successfully, and its property is free from judgment or other lien under which it may be speedily sold, at a sacrifice, the court should not interfere.

6. Where a person is at liberty to require either cash or securities to be deposited with him as indemnity for his promise to pay money, and he voluntarily chooses securities, without deceit or fraud of any kind, he thereby becomes just as much bound to make good his promise, though the securities prove to be less valuable than he thought they were, as he would have been had he asked for and received cash.

On application for the appointment of a receiver, heard on bill .and affidavits and answer and affidavits, and the oral examination of witnesses on the part of the complainant before the court.

*Mr. J. Langdon Ward* (of New York) and *Mr. Thomas N. McCarter,* for the complainant.

*Mr. William Bracken* (of New York) and *Mr. Theodore Runyon,* for the defendant.

VAN FLEET, V. C.

This is an application for the appointment of a receiver. Both ·parties are corporations. The complainant was organized under :a law of the State of New York, and the defendant under a law of this state. They are the creations of different sovereignties, .and for that reason must be regarded as citizens of different states. The complainant claims to be both a stockholder and a ·creditor of the defendant, and seeks to have a receiver appointed for it on the ground of its insolvency. The defendant admits that complainant holds some of its stock as trustee, but denies ·that it is insolvent, and also that the complainant is its creditor. The sum in respect to which the complainant claims to be a creditor is a large one, being nearly $90,000, but its claim, both in whole and in part, is wholly unsupported by an express promise of the defendant. The defendant has never promised to pay a single penny of it in any way. On the contrary, it has always, from the time it was first intimated that a debt existed, disputed its liability, and denied that the complainant was its creditor. But it is not necessary that the complainant should be a creditor.

Its right, as a stockholder, to ask for the appointment of a receiver, if the pecuniary condition of the defendant is such as to warrant the exercise of that power, is beyond doubt. The question, therefore, whether or not the complainant is a creditor of the defendant is wholly immaterial in this case, except it shall become necessary to decide that question in order to properly determine the other and more important issue of the case, namely, is the defendant insolvent? If the defendant has been shown to be insolvent, excluding the claim of the complainant from among its liabilities, then it is a matter of no importance whether the complainant is a creditor or not. In that case, the mere fact that it is a stockholder will entitle the complainant to the aid it asks. If, however, it shall, on the contrary, appear that the defendant is not insolvent unless the claim of the complainant is included among its liabilities, then the question whether the complainant is or is not a creditor will necessarily become one of vital importance. And the court will, in that event, be called upon to decide whether, in a purely summary proceeding where it usually proceeds upon facts which cannot be denied or disputed, and where its action must be prompt and decisive in order to be effectual, it has authority to try a question of disputed debt, respecting which the evidence may be voluminous, contradictory and extremely uncertain and indeterminate, as preliminary to the determination of the question whether or not a corporation is in such a state of insolvency as to justify the appointment of a receiver.

The power to dissolve an insolvent corporation and wind it up, is statutory. It formed no part of the original jurisdiction of the court. It was conferred by a statute passed in 1829, and the language by which it was conferred has remained unchanged from that time to the present. *Elm. Dig. 32* §§ *11, 13 ; Rev. 189* §§ *70, 72.* This statute empowers the chancellor, on the application of a creditor or stockholder, alleging that the corporation in which he is interested has become insolvent, to proceed in a summary way to inquire into the truth of such allegation, and if, upon such inquiry, it shall be made to appear that the corporation has become insolvent, and shall not be about to resume its business in a short time, with safety to the public and

advantage to the stockholders, he may enjoin it from the further
exercise of its franchises, and also from the further transaction
of business; and he may also, at the same time, or at any subse-
quent time during the continuance of the injunction, if, in his
judgment, the circumstances of the case and the ends of justice
require, appoint a receiver to dispose of its assets and distribute
the proceeds. The exercise of this power to its full extent
extinguishes a mere manufacturing or mercantile corporation
completely and forever. The power is a strong one. Chancel-
lor Williamson, in *Rawnsley* v. *Trenton Life Ins. Co., 1 Stock.
95*, called it an extraordinary power—one that should be exer-
cised with great caution, and only when the circumstances of the
case and the ends of justice required its exercise. The statute
makes insolvency the jurisdictional fact. The court can do
nothing—neither issue an injunction nor appoint a receiver—
until insolvency is first established. That, in the language of
Governor Pennington, is the foundation of the power, and
unless it is satisfactorily made out the court has no jurisdiction.
*Oakley* v. *Paterson Bank, 1 Gr. Ch. 173, 176; Parsons* v.
*Monroe Manufacturing Co., 3 Gr. Ch. 187, 206; Brundred* v.
*Paterson Machine Co., 3 Gr. Ch. 294, 305.* Chancellor Hal-
stead expressed substantially the same view in *Goodheart* v. *Rari-
tan Mining Co., 4 Halst. Ch. 73, 77.* And Mr. Justice Depue,
in pronouncing the opinion of the court of errors and appeals,
in *Newfoundland Railroad Construction Co.* v. *Schack, 13 Stew.
Eq. 222, 226*, declared, in describing what averments a bill in
such a case must contain, that it was not sufficient that the bill
should merely allege that the corporation had become insolvent
and had suspended its business for want of funds to carry on the
same, but that the facts and circumstances on which the com-
plainant relies to prove insolvency must be set out. If it is
necessary that the facts and circumstances showing insolvency
must be alleged, it follows necessarily, according to the uniform
course of judicial procedure, that if such facts and circumstances
are denied, they must be proved before the judicial action asked
can be granted. It is thus made manifest that, both according
to the plain letter of the statute and the uniform construction it

has received, the power of the court in such cases depends exclu-- sively on the fact of insolvency, and that until that fact is clearly established the court .can do nothing. .

The proof in support of a jurisdictional fact must always be- clear and convincing, for the court derives its power from the- fact, and hence, until the fact is shown to exist it has no power.. To doubt in such a case is to deny. The adoption of the oppo-- site rule would unquestionably, in some cases, result in usurpa- tion or an abuse of power. This is the view expressed by- Governor Pennington, in *Brundred* v. *Paterson Machine Co.*,. *supra*. He there said, that where the proofs left the fact of insolvency in doubt—his words are, " if it be a balancing ques- tion "—and the conduct of those who have had the management of the affairs of the corporation appears to have been upright and just, the court must resolve its doubt against the application and refuse to interfere. Nor is it the duty of the court to use its power in all cases where insolvency is shown. Something more is required. The prerequisites prescribed by the statute- are, that it shall be made to appear that the corporation has become insolvent, and, also, that it will not be able to resume its- business in a short time with safety to the public and advantage to the stockholders. The power is only to be used when the ends of justice require its exercise. The court should strive in such cases to foster and preserve rather than to strangle or destroy. I suppose that but few manufacturing or mercantile- enterprises can be found, the business of which has been con- ducted according to the usual method of buying and selling on credit, and which have been in existence long enough to have passed through a period of great financial distress, when business- was depresed, money scarce and values depreciated, that have not been in a condition of insolvency—when enough could not have- been realized from their assets, in any speedy way, to discharge their liabilities. At such times assets shrink and shrivel in value, but liabilities remained unchanged. They never diminish. Now, it is easy to see, if the court should put forth its power at such a time merely because the corporation assailed had, from such causes, become insolvent, it would do harm rather than good.

and that instead of giving protection to creditors it would imperil their safety, and instead of preserving the rights of stockholders it would destroy the value of their stock. The principle which I think should control the court in the exercise of this power is this: never to appoint a receiver unless the proof of insolvency is clear and satisfactory, and unless it also appears that there is no reasonable prospect that the corporation, if let alone, will soon be placed, by the efforts of its managers, in a condition of solvency. To illustrate: where the corporation attacked is shown to be insolvent, but it also appears that its managers are honest and capable, and that they are striving to the best of their ability, with a fair prospect of success, to relieve the corporation from its embarrassment and to put it in a condition where it may prosecute its business successfully, and the property of the corporation is free from judgment or other lien under which it may be sold speedily, at a sacrifice, the court should not interfere. Mere insolvency is not enough to induce the court to act; but to induce it to act, such a state of insolvency must be shown as satisfies it that the corporation will not be able in a short time to resume its business with safety to the public and advantage to the stockholders. Such I understand to have been the view entertained by Governor Pennington. In *Brundred* v. *Paterson Machine Co., supra,* he said (at *p. 305*): "It would be unwise, and against public policy, to seek an occasion for interference with any corporation, so long as they are striving against adversity with an honest purpose, unless their case is hopeless, or their course of action so unfair as to jeopardize the interest of creditors and the public." It is thus seen that the establishment of the fact of insolvency does not make it the duty of the court to appoint a receiver in all cases and under all circumstances, but simply places it in a position where it must exercise its best discretion, and either to appoint or refuse to appoint as the ends of justice, having due regard to the safety of the public and the best interest of creditors and stockholders, shall seem to require. But until insolvency is proved, no foundation is laid for the exercise of discretion, and in any case

where the proofs fail to establish that fact, clearly and satisfac-
torily, the court must decline to act for want of jurisdiction.

This brings us to the initial question of the case, namely, has
it been proved that the defendant is insolvent? The burden of
proof is on the complainant. The defendant was organized in
April, 1890, with a capital of $3,000,000, divided into one hun-
dred and twenty thousand shares of $25 each. Among the
purposes for which it was organized were the manufacture, use
and sale of electrical storage batteries. Making and selling such
batteries is its principal business. The battery it makes is used
for power, traction and illuminating purposes. Soon after the
defendant's organization nearly the whole of its stock—one hun-
dred and nineteen thousand, nine hundred and sixty shares of
the one hundred and twenty thousand—was issued to the com-
plainant. The par value of the stock so issued was $2,999,000.
It was issued to the complainant to enable the complainant to
acquire for the defendant the title to the storage battery plant
and machinery then in a factory occupied by Henry G. Morris
and Pedro G. Salom, at Camden, in this state; a patent issued
to Edmund Julien, and two patents issued to Henry G. Morris
and Pedro G. Salom; and also for the purpose of enabling the
complainant to acquire for the defendant an exclusive license to
make and sell storage batteries throughout the United States,
under patents granted to Charles F. Brush. The resolution
under which the one hundred and nineteen thousand, nine hun-
dred and sixty shares were issued, declared, that the value of
the property which the shares were issued to purchase was, in
the opinion of the directors of the defendant, equal to the par
value of the shares; in other words, the resolution declared that
the property to be purchased with the shares was, in the opinion
of the directors of the defendant, worth $2,999,000. The com-
plainant, when it received the stock, knew of this resolution,
and that the defendant estimated the value of the property,
which the stock was issued to purchase, at $2,999,000. All of
the property which the one hundred and nineteen thousand, nine
hundred and sixty shares were issued to purchase has been trans-
ferred to the defendant. The defendant is still the owner of it.

The complainant's bill says that the property was transferred to the defendant in pursuance of the resolution under which the one hundred and nineteen thousand, nine hundred and sixty, shares were issued to the complainant.

The proofs show that the defendant's assets, exclusive of its patents and license, are worth about $25,000, and that its liabili- ties, excluding the claim asserted by the complainant, amount to about $57,000. If this statement was fair to the defendant and embraced everything which, on such an application, was entitled to be treated and considered as assets, there can be no doubt that it would show that the defendant was in a state of hopeless insolvency. It would then appear that the defendant's assets were not sufficient to pay fifty cents on the dollar of its liabilities, and if the claim of $90,000, asserted by the complainant, should be established, they would not be sufficient to pay more than ten or fifteen cents on the dollar. But this statement is manifestly unfair to the defendant. It leaves out of view that part of the defendant's property which, from the beginning, has been regarded by it, and by the complainant too, as its most valuable asset, and which the undisputed facts of the case show consti- tuted nearly the whole foundation of its immense capital. The principal purpose for which the defendant was created a corpora- tion was to make and sell a patented article—to make and sell an article that no other person could lawfully make and sell; its machinery and other property are, therefore, mere adjuncts or accessories to its patents. Its patents are the foundation of its business; they constitute its principal substance and main source of wealth. They are the only foundation the corporation has. But for them no corporation would have been formed, and with- out them the corporation could do nothing and would be nothing. It would have no business, and would, beyond all question, be a dead and useless concern. From the defendant's organization its patents have been carried on its books at a valuation of over $2,700,000. In this situation of affairs, it is manifest, that it is not possible for the court to declare the defendant to be insolvent until proof has been submitted as to the value of the patents, or it has been proved that they are worthless. The complainant

has not offered one word of proof on this subject.   It has neither
attempted to show the value of the patents, nor that they are
worthless.   The only proof in the case tending to show their
value is such as is found in the contracts respecting them which
have been put in evidence, the dealings which have taken place
in relation to them, and such as is furnished by the defendant's
witnesses, by affidavit annexed to the answer and cross-examina-
tion thereon.   And here it is necessary to say, in order to show
just how the proofs stand, that the defendant has not been fully
heard on this branch of the case.   When the complainant had
concluded its evidence and rested, I thought that the proofs so
entirely failed to establish the fact of insolvency that the defend-
ant ought not to be put upon its defence, and therefore directed
that the argument should proceed, reserving to the defendant the
right to be heard by its proofs, at a subsequent time, in case the
argument and further consideration resulted in convincing me
that a sufficient case of insolvency had been established to make
it the duty of the court to appoint a receiver.   The defendant's
full defence is not, therefore, before the court.   My view respect-
ing the defective character of the evidence, as to the vital fact of
the case, has, since then, undergone no change, except, perhaps,
my conviction that it fails to establish such fact is rather stronger
now than it was when the complainant rested.

And, now, what do the proofs show the value of the patents
to be?   The president of the defendant corporation swears that
he believes them to be worth, at a low estimate, $2,000,000.
They are all for such electrical devices as are useful in the manu-
facture of storage batteries.   The defendant claims, indeed, that
no practical storage battery, such as can be used for traction and
power purposes with commercial success, can be made without
them.   There is proof in the case giving substantial support to
this claim.   It was elicited on the cross-examination of the com-
plainant's witnesses.   The person who swears that he believes
the patents to be worth $2,000,000 possesses the requisite knowl-
edge and experience to entitle what he says on that subject to
consideration.   Though a lawyer by profession, he has for sev-
eral years made electricity, as applied in utilizing light and

power, a study.   For more than five years he has been one of the executive officers of corporations engaged in the manufacture and sale of electrical appliances.   His cross-examination of the complainant's expert witnesses, those who gave evidence as electricians and electrical engineers, demonstrated that he possessed a very thorough knowledge of almost all the patented devices which, during the last fifteen years, have been used, either in this county or in Europe, in the numerous efforts that have been made to construct a storage battery which would prove to be a success both electrically and commercially.   He showed that his knowledge of the history and development of storage batteries and of the electric art generally was quite as exact and thorough as that of the most accomplished expert witness called by the complainant.   His opinion as to the value of the patents is entitled, in my judgment, under the peculiar circumstances of this case, to be treated and considered as evidence.   He speaks, it is true, under a strong bias; he is deeply interested in the defendant corporation ; its success will probably bring him riches and its failure ruin ; he was one of its chief promoters and consented to the purchase of the patents at, what seems to me, to be an enormous sum of money.   His interest and his hopes may have affected his judgment—they may have controlled it—and his estimate may be the expression of his hopes rather than the result of the exercise of his judgment.   Consequently, if any other competent person had given evidence on this subject, and placed the value of the patents at a much lower sum, especially a person entirely free from bias and wholly disinterested, the considerations just mentioned would, as it seems to me, have been decisive against the adoption of his estimate.   But there is no such evidence.   His estimate stands alone and unimpeached. No person, qualified or disqualified to speak as to the value of this kind of property, has come forward and said that his estimate is false, absurd, or even excessive.   It constituted part of the evidence which the defendant annexed to its answer and put forward to defeat the complainant's application.   The complainant knew of it for nearly a month prior to the commencement of the hearing before the court on the order to show cause, but

neither at the hearing or at any other time has the complainant made the slightest attempt to meet or disprove it. It stands unchallenged and uncontradicted by any opposing or conflicting evidence. The deduction to be made from this state of facts seems to me to be obvious and unavoidable, and it is this: either that the estimate of this witness is fair and reasonable, or approximately so, or that it cannot be proved, by trustworthy evidence, that the patents are of a value so insignificant as to put the defendant in a state of insolvency.

This is all the evidence there is, on either side, going to show the aggregate value of the patents, or their value as a unit, except such as is furnished by the action of the defendant in issuing to the complainant nearly the whole of its capital stock to be used in the purchase of certain property. The complainant says, by its bill, that all the items of property mentioned in the resolution, under which all of the defendant's stock, except forty shares, was issued to it, were transferred to the defendant "in pursuance of said resolution." By the resolution here referred to, it was declared that the value of the property which the defendant should acquire in consideration of the stock to be issued to the complainant, was, in the judgment of the defendant's directors, the sum of $2,999,000. It is an undisputed fact that the complainant accepted stock from the defendant, of the par value of $2,999,000, to purchase certain property for the defendant, which the defendant's managers estimated to be worth a sum equal to the par value of the stock, and that the property was purchased and transferred to the defendant and that the defendant still owns it. It is likewise a fact that the complainant has not proved, nor attempted to prove, the value of the defendant's property. In its bill it charges that the defendant's patent account, in which its patents are put down at a valuation of over $2,700,000, "consists entirely of patents and options and other invisible and intangible assets;" and in an affidavit annexed to its bill, it is said that the same item of defendant's assets consists of patents and options relating to electric machinery and apparatus, and does not consist of real estate or tangible personal property, but not one word is said on

the subject of value.   In May, 1891, the person who made this affidavit made an investigation of the affairs of the defendant, by direction of one of the officers of the complainant and with the aid of defendant's president, and subsequently made a report in writing, in which he said that the Brush patents either had a fortune in them or nothing, but that he believed that the result would show that the latter was not the case.   He also said that it had been represented to him that a total investment of $1,200,000 had been made in patents and other property for the manufacture of storage batteries by the Julien Electric Company and the defendant corporation, and then added :   " Now, all this money, and a great deal more, may easily come out of the Brush patents."   From the character of the service that this person was employed to perform, as well as from the subject upon which he was required to make a report, it may fairly be inferred that he possessed, as his employer believed, the qualifications necessary to form a trustworthy judgment respecting the value of the defendant's patents, yet, it will be observed, he says nothing at all on that subject in his affidavit, but does take the trouble to state a fact that cannot be disputed, but which is, nevertheless,. almost ludicrously inconsequential, namely, that patents are not real estate or tangible personal property.

The value of the Brush license to the licensor must, I think,. be regarded as unalterably settled.   The license was granted by the Brush Electric Company, of Cleveland, Ohio (the owner of the Brush patents), for a term of six years, extending from April 1st, 1890, to April 1st, 1896, with a right in the licensee to take an additional term extending from the date last named to March 2d, 1903.   The terms upon which it was granted were : first, the payment of $65,000 in cash, and, second, the payment of a minimum royalty of $25,000 a year, making a total, for the cash payment and the royalty for six years of $215,000.. The $65,000, and so much of the royalty as has become due, has been paid.   The defendant did not pay them, but the complainant did, and the complainant is bound to pay such part of the royalty as shall hereafter accrue, as it becomes due, to the Brush company.   This obligation arises out of a tripartite agree—

ment made on the 2d day of June, 1890, by the defendant as the party of the first part, the Brush company as the party of the second part, and the complainant as the party of the third part. By this agreement the complainant admits that the defendant has placed in its hands the sum of $215,000, to stand as security for the payments, which, by the terms of the license, are to be made. to the Brush company. And the agreement, among other things, also provides that, in case the defendant shall itself pay to the Brush company the minimum royalty accruing under the license for any year, either in whole or in part, then that the complainant shall pay to the defendant either the whole or so much of the $25,000 held by it as security for the payment of the royalty of that year, as the defendant shall itself have paid. The proofs show that the defendant did not itself pay to the complainant $215,000, as the agreement declares, but that such payment was made by another person, not in money, but by a note, and under the circumstances which will now be stated. Prior to the 10th day of April, 1890, William Bracken and Henry R. Waite held an option for the purchase of the license which the Brush company subsequently granted to the defendant. One of the terms of this option required the licensee, in case a license was granted, to give satisfactory security that the payments, constituting the consideration for the license, should be made. On the date last named Bracken and Waite made a contract in writing with Robert L. Belknap, by which they agreed to transfer their option to the defendant, and Belknap agreed to furnish to the complainant, on the demand of Bracken and Waite, all the moneys which were to be paid to the Brush company, and also the security which that corporation was entitled to by the terms of the option. Belknap further agreed to provide the defendant with a working capital of $100,000. As the consideration for providing a working capital of the amount just named, and also for furnishing the money and securities to be paid to and held for the benefit of the Brush company, sixty thousand shares of the defendant's capital stock, representing a value, at par, of $1,500,000, were to be delivered by the complainant to Belknap. This contract was performed

by Bracken and Waite. They transferred their option to the defendant, and a license was subsequently granted by the Brush company to the defendant in accordance with the terms of the option. The sixty thousand shares of the defendant's stock were also delivered to Belknap. That part of the contract which imposed obligations on Belknap was not performed by him, but was performed, so far as it was performed at all, by the United Electric Traction Company, a corporation of which Belknap was president. The $215,000, which the complainant, by the tripartite agreement, admitted had been placed in its hands, was placed there in this way : the United Electric Traction Company (which for brevity will hereafter be called the Traction company) made its note to the complainant on June 4th, 1890, for $215,000, payable at six months, with interest at six per cent., and delivered to the complainant, with the note, a large quantity of stock and some other property as security for the payment of the note. Among the stock so delivered were the sixty thousand shares of the defendant's stock which had been previously delivered to Belknap. The complainant accepted the note and the collaterals accompanying it, and thereupon, in compliance with the request of the Traction company, credited that company on its books with $215,000. The Traction company then, on the same day, drew a check in its own favor on the complainant for the amount standing to its credit on the complainant's books, and requested the complainant, in payment of the check, to issue to it a certificate of deposit. The complainant issued such certificate, and by it declared that it had received from the Traction company the sum of $215,000, and promised to pay interest thereon at the annual rate of four per cent. The Traction company then assigned the certificate of deposit to the complainant, for the purpose of placing the $215,000 in the hands of the complainant, to be held by it, as a letter written by the president of the Traction company to the complainant, and purporting to have accompanied the transmission of the certificate of deposit from the hands of the Traction company to the hands of the complainant, declares—

"subject to the terms and conditions of a certain agreement between the Consolidated Electric Storage Company of the first part, the Brush Electric Company, of Cleveland, Ohio, of the second part, and the Atlantic Trust Company of the third part."

By this arrangement, it will be observed, that the complainant was entitled to receive interest at the rate of six per cent. per annum on the $215,000, but became bound to pay only four. The complainant still holds the note of the Traction company and the collaterals pledged for its payment. No part of the note has been paid and nothing has been realized on the collaterals. It is also a fact that this court, in May, 1891, adjudged the Traction company to be insolvent and appointed a receiver to wind it up.

These facts seem to me to make one thing perfectly plain, and that is, that they unalterably fix the value of the Brush license as against the complainant, and in favor of the Brush company and the defendant, at $25,000 a year during the remainder of the term for which the license is to run. There can be no doubt that, by the terms of the tripartite agreement, the complainant is irrevocably bound to pay that sum annually to the Brush company, and it is equally clear, by the terms of the same agreement, that if in any year the complainant shall not be required to pay that sum to the Brush company, because the defendant shall itself have paid the royalties for that year, the complainant will, in that event, be bound, by an obligation precisely similar to that which it is under to the Brush company, to pay the $25,000 for that year to the defendant. The effect of the tripartite agreement, as I understand it, is to give the defendant the right to use the Brush license free of charge to the extent of $25,000 a year, for it plainly provides that, if the defendant shall itself pay the royalties accruing under the license for any year directly to the Brush company, the complainant shall, in that event, pay the $25,000, held by it as security for the royalty of that year, to the defendant. The respective positions of the defendant and complainant under the agreement may then be correctly stated as follows: if the defendant pays the royalties to the Brush company as they accrue, the complainant

thereby becomes bound to pay to the defendant, at the end of the year, the sum which it holds as security for the royalty of that year; if, however, the defendant does not pay the royalties to the Brush company, as they accrue, then the complainant stands bound to pay them to the Brush company to the extent of $25,000 a year, but such payment will impose no liability on the defendant.    There is nothing in the agreement which will support even a suspicion that it was the intention or expectation of any of the parties to it that the complainant should, in any event or under any circumstances, be entitled to be reimbursed by anybody for any money it should pay out under the agreement.    It was impossible that such an intention or expectation could have existed in the mind of any of the contracting parties, for the corner-stone of the agreement—the foundation on which every promise in it rests—is that $215,000 had been made over to the complainant, either in cash or in such securities as it was willing to accept in lieu of and as the equivalent of cash.

The complainant occupied, in the negotiation of the tripartite agreement, a position where it was master of the situation, and where it could make its choice or will, as to the thing which should be deposited with it to stand as indemnity for its promises, the law unto all the parties.    It was in a position where it had the power to dictate terms and to demand money or anything else for its indemnity that it saw fit.    While thus master of the situation, it accepted the note of the Traction company, with the collaterals accompanying it, and treated and dealt with them as equivalent, in all respects, to $215,000 in current funds.    It did so voluntarily and deliberately, without fraud or evil practice of any kind.    It does not pretend that any misrepresentation was made to it, nor that it was deceived or defrauded in any way, nor that its action was the result of mistake.    Everything appears to have been open, fair, honest and well and correctly understood. And just here, I think, it is important to remember, that among the things made over to the complainant for its indemnity, and which it accepted as part of the consideration for its promises to the Brush company and to the defendant, were the same sixty thousand shares of the defendant's stock which had been deliv-

ered to Belknap under the contract, by which he agreed to provide the money and security necessary to comply with the terms of the Brush license, and also provide $100,000 to the defendant for working capital. So that the fact is, the complainant now holds the very consideration which the defendant paid not only for the $215,000, but for $100,000 in addition. In this posture of affairs, it does not seem to me that there can be the least doubt respecting the defendant's rights under the tripartite agreement. In my judgment, it has a clear right to use the Brush license for the remainder of the existing term, without making compensation to any one, provided the royalties accruing under the license in any year do not exceed $25,000. It is also my judgment that the complainant stands just as much bound to pay that sum each year, during the continuance of the present license, either to the defendant or for its benefit, as it would have been had it, instead of accepting the securities it did, received $215,000 in actual cash. It was at liberty to demand either cash or securities; it chose securities; it did so in the free exercise of its own judgment, uncontrolled by fraud or other improper influence, and obviously with the design to gain the difference between the rate of interest which its debtor was to pay and that which it was to pay, and must, therefore, in obedience to those principles of right and justice which constitute the foundation of all legal obligation, be held to be just as firmly bound by its promises as it would have been had it chosen and received money instead of securities.

This view decides this case in all its branches. It demonstrates that the complainant is not a creditor of the defendant. The only foundation on which it rests its claim as a creditor is that it has made the payments to the Brush company, which, by the tripartite agreement, it promised to make. But it did not thereby become a creditor of the defendant. As already shown, the rights of the defendant, against the complainant, under that agreement, stand, in a legal point of view, precisely as they would have stood had the complainant, instead of taking securities as the consideration for its promises, asked for and received actual cash. In the latter situation of affairs, a claim that the

·complainant had become a creditor of the defendant, by paying ·out the cash which had been placed in its hands for that very purpose, would have been so manifestly groundless as to have been unworthy of the least consideration. And yet the two ·cases are, in my judgment, in their essential legal elements, precisely the same. The view above expressed also shows that the value of the Brush license alone, as fixed by a contract to which the complainant is a party, is more than sufficient to pay all the defendant's debts. Besides, it appears that the defendant's affairs have been managed with more than ordinary skill and economy. None of its paper has ever been protested; no suit for the recov-·ery of a debt by an action at law has ever been brought against it; it has never failed to pay a debt on demand, and its property is free from both judgment and mortgage. It has, however, been ·prevented, by want of funds, from doing as large a business as ·it desired to do. The Traction company failed to keep its promise to provide $100,000 for working capital; the defendant ·was, in consequence, compelled to look elsewhere for capital; it ·tried to borrow it of its stockholders and obtained some, but not ·enough. Its managers then reduced its expenses and gave up their salaries. When the bill in this case was filed they were working gratuitously, with all the energy and ability they pos-·sessed, trying to enlarge and extend the defendant's business, and to place it in a position where its ultimate success would be made ·sure. That being so, it would have been the duty of the court, ·as I understand the principle which must control its action in such cases, even if a case of insolvency had been satisfactorily made out, to have declined to exercise its power, unless it had also been shown that there was no reasonable ground to believe that the efforts of its managers to relieve it from its embarrassment would be successful.

The complainant's application must be denied, with costs.