CHARLES OAKLEY v. The President, Directors and Company of the PATERSON BANK.

On a proceeding against a company, under the sixth section of the act entitled "An act to prevent frauds by incorporated companies," passed February 16th, 1829, the great and primary fact to be ascertained, is the insolvency of the company. That lays at the foundation of the whole proceeding, and unless satisfactorily made out, the court has no right to interpose.

The provisions of the seventh section of the act, are not to be understood as restricting the court to any particular mode of proof in ascertaining the insolvency of a bank, but as superadding certain tests which shall in all cases constitute full evidence of such insolvency.

A bank may be insolvent, without any of the events happening which are stated in the seventh section of the act; and although some of those marks of insolvency may have occurred, yet the bank may, upon further proof, be shown to be sound and safe.

The court may act upon the tests given in this section, or they may go further and look beyond them, if they see reason to do so, in coming to a satisfactory conclusion as to the solvency or insolvency of the company.

A bank without funds for the redemption of its notes, and depending on indi-

[Oakley v. Paterson Bank.]

vidual resources and exertions to provide funds for the redemption of its notes, rather than upon the immediate ability of the institution itself, is insolvent within the true intent and meaning of the act.

The act requires that the bank should be at all times prepared to discharge all demands presented for payment; and it can never be freed from the charge of insolvency upon any supposed ability of realizing from its means enough to pay its debts at a future day.

The act entitled "An act to restrict the circulation and discounts of the Paterson Bank, for the time being," passed February 1st, 1838, did not exempt that bank from the operation of the general act of February 16th, 1829.

The authority of appointing receivers of an incorporated company, under the act of February 16th, 1829, is a delicate one, and should be cautiously exercised. It by no means follows, that, because an injunction is granted, receivers should be appointed.

That one of the directors is indebted to the bank; that he is security for his son, who was formerly cashier, and that he is using means to avoid responsibility in that respect, and that there is division and discord in the board of directors, affords no just ground for divesting the board of the property and vesting it in receivers.

In the appointment of receivers, the court will not rest upon affidavits stating, as matters of belief, that great frauds have been committed against the bank, without stating by whom committed, or in what those frauds consist.

Under the statute, the complainant may, upon any new state of facts, renew his application for the appointment of receivers.

On the 18th of February, 1839, Charles Oakley filed his bill of complaint against the President, Directors and Company of the Paterson Bank, for an injunction and the appointment of receivers, under the act, entitled, "An act to prevent frauds by incorporated companies," passed February 16th, 1829. The bill, after referring to the act of incorporation, and the several other acts relating to the bank, and stating generally the time and mode of its going into operation and transacting its business, charges that the principal part of the capital of the bank had been lost by enormous loans to Benjamin Rathbun, of Buffalo: that about twenty-seven thousand dollars had been loaned by L. S. R., the late cashier, without the knowledge of the board, to an agent of Rathbun, which was to have been secured by an assignment from Rathbun to certain of his creditors; but that the claim of the bank for that sum was contested, on the ground

that the late cashier had taken usurious interest. That L. S. R., the late cashier, had given bond as cashier in five thousand dollars, with A. R., his father, as security; which bond was in the hands of D. K. A., one of the directors of said bank. That the circulation of the bank had been reduced to two thousand five hundred dollars. That the bank claims a large amount against said A. R., who is one of the directors; and that said A. R. is endeavoring to obtain from the board of directors an order for the sale of all the claims of the bank against Rathbun, amounting to ninety-eight thousand dollars, for the inadequate sum of two thousand dollars, in order that the said A. R. may be relieved from his liability as security on said bond of L. S. R., the late cashier. That there are no funds in the bank to meet the bills of the bank. That on the 18th or 19th of February, 1839, bills of said bank were presented at the counter of the bank, to the president, who was acting as clerk, in the presence of the cashier, and payment thereof demanded, within the usual and proper hours of business; and that payment thereof was then and there refused, the president answering that they had no funds. That the bank then stopped payment, and have not since that time paid any of their bills, although they have been frequently presented for payment. That the bank has refused to redeem the same in any way; and that there are no assets of the bank from which money to any amount can be realized, except from the said claims against Rathbun and A. R.; and that complainant is a large stockholder. The bill prays an injunction, and the appointment of receivers for the purposes specified in the act.

All the material charges of the bill, excepting that the bank had refused to redeem its bills and had stopped payment, and that complainant is a stockholder, are made upon the information and belief of the complainant. The bill is accompanied by an affidavit of the complainant in the usual form, and also by an affidavit of the cashier of the bank, stating that the bank had refused to redeem its bills when presented at the counter and payment demanded during the usual hours of business, the presi-

[Oakley v. Paterson Bank.]

dent saying they had no funds, and that the funds of the bank are exhausted.

Upon filing the bill, an injunction was issued, as prayed for. The cause came on for hearing on the 14th of March, on the application for the appointment of receivers, and also upon a motion, on the part of the defendants, to dissolve the injunction. It appears that affidavits were taken and used on the argument, but the affidavits are not on file, nor does it appear whether they were taken exparte or upon notice, or in pursuance of an order of the chancellor. The opinion was delivered on the 18th of March, 1839.

*A. S. Pennington* and *E. Vanarsdale*, for complainant.

*Dickerson* and *I. H. Williamson*, for defendants.

THE CHANCELLOR. This is a proceeding under the act, entitled, "An act to prevent frauds by incorporated companies," passed 16th of February, 1829.

No question can be raised as to the general powers of the court to interfere with corporations, for the whole structure of the bill confines it to a case under the statute, and the jurisdiction of the court must, therefore, be derived from that source alone.

The sixth section of the said act authorizes the chancellor, whenever any incorporated company shall become insolvent, upon the application of either a creditor or stockholder, to restrain by injunction such company from the further exercise of any of the privileges or franchises granted by its charter. The great and primary fact to be ascertained, is the *insolvency* of the company. That lays at the foundation of the whole proceeding, and unless satisfactorily made out, the court has no right to interpose. I do not understand the provisions of the seventh section of the act, as restricting the court to any particular mode of proof, in ascertaining this important fact in the case of a bank, but as superadding certain tests, which shall in all cases constitute full evidence of such insolvency. It was seen that in the case of a

bank, it might be very difficult to obtain such a knowledge of its affairs as to enable the court to say whether it was actually insolvent or not; it was, therefore, thought expedient explicitly to state what kind of proof should be deemed sufficient for that purpose.

A bank may be insolvent without any of the events happening which are stated in the seventh section; and, although some of those marks of insolvency may have occurred, yet the bank may, upon further proof, be shown to be sound and safe. The court may act upon the tests given in this section, or they may go further and look beyond them, if they see reason to do so, in coming to a satisfactory conclusion as to the solvency or insolvency of the company.

In the present case, there is abundant reason for declaring this company insolvent within the meaning of this act, as well upon the tests given in the seventh section, as upon the whole case disclosed by the evidence. By the oath of the cashier affixed to the bill, he declares the funds of the bank to be exhausted, and that they have had no funds since the 19th of February last. The bank has refused recently, in two or three instances, to pay its notes when presented. It is said, however, that as one of the directors had promised to furnish private funds for the redemption of the notes of the bank, some others of the directors, to try whether he had done so, embraced an opportunity when he was in the bank to have these bills presented by a third person. This being a stratagem to ascertain another fact, might with propriety be disregarded, as not being such a presentation and refusal as is contemplated by the act. But going behind the form of the transaction, it discloses a state of things which proves beyond all doubt that the bank was without funds, and depending entirely on the private funds of the directors. It is plain that the directors have been in the habit of depending more on their individual resources and exertions to provide funds for the redemption of the notes of the bank, than upon the immediate ability of the institution itself. But for these exertions, it must have long since ceased to pay, and been put an end to. That a bank thus cir-

cumstanced is insolvent within the true intent and meaning of the act, I entertain no doubt. Every provision in the act calls for the bank being at all times prepared to discharge all demands presented for payment; and it can never be freed from the charge of insolvency upon any supposed ability of realizing from its means enough to pay its debts at a future day.

It is insisted, however, in this case, that by the act of the 1st of February, 1838, this particular bank was placed in a different position from other institutions, and exempt from the operation of the act on which this suit is founded. I do not so consider it. There is nothing in the title or preamble, or in the enacting clause, that can lead to such a conclusion. The returns made to the governor by the different banks in this state, under a particular law, at a time of great depression and alarm in the money market, opened to the public the true condition of the banks, and among others of the Paterson bank. It was seen that their funds were locked up. And to avoid embarrassment to the public, the sole design of the act was to prohibit further issues and discounts. So far as it went, it was a partial injunction by legislative enactment, and can never, by any forced construction, have been intended to prohibit the chancellor from going further, in case the company came within the scope of the former acts regulating banking companies. It would have been strange indeed, if the very embarrassments of a company, as shown by the exhibit they made, should have induced the legislature to exempt them, by a particular act, from the operation of a law, the object of which is to guard the public against injuries arising from their insolvency.

This company must, therefore, stand, in my judgment, as all other companies, no way relieved by the act of 1838 from the operation of the general act under which this suit was instituted; and, by the evidence, it is shown to be insolvent within the true intent and meaning of that act.

I am now moved, under the eighth section of the aforesaid act, to appoint receivers to take charge of the effects and wind up the concerns of this bank. This I am authorized to do, " if

the circumstances of the case and the ends of justice require it." This authority is a delicate one to be exercised, and I thought proper, before doing so, to hear counsel, and to be possessed of the whole case. The effect of appointing receivers is to take the property out of the hands and control of those persons to whom the stockholders (and in the present situation of the bank they are the persons principally interested) have confided it. After the best reflection in my power to bestow on the subject, I have come to the conclusion that receivers ought not to be appointed. It by no means follows, that, because an injunction is granted, receivers should be appointed. They are independent questions. Circumstances may call for the suspension of the operations and business of a bank, while the directors then in charge of its affairs may be in no respect implicated, and they may be of all others the best calculated to wind up its concerns, and that with the least expense to the parties in interest.

There is one redeeming feature in the case of this bank, which has made a strong impression on my mind as to the conclusion I ought to come to. When Rathbun failed, in August, 1836, he was indebted to this bank in ninety-eight thousand dollars, and the circulation of the bank was one hundred and two thousand nine hundred and eighty-three dollars. The directors then went to work to pay off its debts; and in November, 1837, reduced the amount of its circulation to twelve thousand four hundred and seventy-four dollars. This amount was then increased, as is alleged, under the influence of the complainant, to forty-six thousand seven hundred and ninety-three dollars. Since that time, the directors have gone on again and reduced the circulation, until it is admitted on all hands to amount at this time only to about two thousand five hundred dollars. The complainant has principally paid off his debt, which was large, and I find no charge any where made that the directors have misapplied any of the funds. They appear, on the contrary, from the results, to have assiduously exerted themselves to pay off the debts of the bank. That the exorbitant loans to Rathbun were improvident, and brought this bank into great embar-

rassment, cannot be doubted ; but in doing justice to all parties, I feel bound to declare my conviction, that the conduct of the directors since that event, so far as disclosed by the evidence, shows a meritorious determination to maintain the credit of the bank at all hazards. Do the ends of justice, under such circumstances, require, either for the interest of the creditors or stockholders, that they should be displaced and other persons substituted in their stead? Could any men have gone further in liquidating the demands against the bank? Have they done else with the funds than apply them in the proper manner to pay the debts? Could they have done more to realize the assets of the institution? Judging from the evidence, I am bound to answer all these questions in the negative.

But it is said that Abraham Reynolds, one of the directors, is indebted to this bank; that he is security for his son, who was formerly cashier, and that he is using means to avoid his responsibility in that respect. This he denies in his affidavit. At most he is but one of the directors; and it would be going a great way without evidence to suppose, that a majority of the directors, and those largely interested in the stock, were uniting with him in a plan to defraud the company, and that, too, against their interests. It is also said, and truly, that there is division and discord in the board of directors. Is this any just ground for divesting the whole board of the property? How often, if such ground was sustained, would the interference of the court be sought? The majority, in all such cases, must rule. Every man who takes stock in a company, agrees that such shall be the result. I cannot, therefore, make this alone a foundation for interfering.

In some of the affidavits, it is stated, as the belief of the persons making them, that great frauds have been committed against the bank; but by whom committed, or in what these frauds consist, is not stated. This is too general for the court to rest upon.

There is only one other matter to which I will advert, as a reason urged for appointing receivers; and that is, the proposed plan for selling out the whole claim against Rathbun for two

[Oakley v. Paterson Bank.]

thousand dollars. This may or may not be a wise step, according to circumstances, and of which I have no materials upon which to form a judgment. There is a fact, however, connected with this matter, worthy of being stated, viz: that while the measure has been broached at the board, it has not yet been adopted, and the stockholders have been consulted on the subject by order of the board. This does not, to my mind, look like a designed fraud.

Upon the whole case, I am constrained to think, that in the exercise of that discretion with which the act in question has invested me, this case does not call for the appointment of receivers upon the facts as at present disclosed before the court, and I shall accordingly decline making such appointment. As to the injunction, that must, as a matter of course, be so modified as to authorize the receipt by the directors of the dues of the bank, and the payment by them of its debts. As to any further modification, it must be upon notice. It will, under the statute, be in the power of the complainant upon any new state of facts, to apply again for the appointment of receivers, which I hope the prudence and correct conduct of the directors will give no just occasion for. The question of costs is reserved.

Order accordingly.