This matter is now before the court on the return of an order requiring the defendant to show cause why the prayer of the complainant's bill of complaint should not be granted. The complainant by his bill filed on behalf of himself and all other stockholders of the defendant who may come in and contribute to the expenses of the suit alleges that the defendant has been and is conducting its business at a great loss and greatly prejudicial to the interest of its creditors and stockholders, so that its business cannot be conducted with safety to the public and advantage to its stockholders, and prays for a writ of injunction to restrain the defendant and its officers and agents from exercising any of its privileges or franchises, and for the appointment of a receiver, pursuant to the provisions of "An act concerning corporations [Revision of 1896]" as amended and supplemented. The defendant is the corporate successor of Consolidated Rubber Tire Company, which was incorporated under the laws of this state April 15th, 1899, the corporate name having been changed to Kelly-Springfield Tire Company on January 2d 1914. It has an authorized capital of thirty-nine thousand and three shares of first preferred (class A) stock of the par value of $100 per share, of which twenty-nine thousand five hundred shares, with a total par value of $2,950,000 are now issued and outstanding; seventy thousand shares of second preferred (class B) stock of the par value of $100 per share, of which fifty-two thousand six hundred and forty-seven shares, with a total par value of $5,264,700 are now issued and outstanding, and one million two hundred thousand shares of common stock without par value, of which one million sixty-three thousand eight hundred and forty and eleven one-thousandths shares are now issued and outstanding and carried on its books at a value of $23,796,002.75. *Page 547 
The aggregate shares of stock issued shows a liability of the defendant to its stockholders of $32,010,702.75. The first preferred stock entitles the holders thereof to cumulative dividends thereon at the rate of six per cent. per annum and is redeemable by the company at $110 per share, plus accrued dividends. The defendant is permitted, for the purpose of effecting such redemption, to maintain a sinking fund by annually setting aside two per cent. of the par value of the stock outstanding. No such fund has been created. The second preferred stock entitles the holders thereof to cumulative dividends thereon at the rate of eight per cent. per annum and is redeemable by the company at $125 per share, plus accrued dividends. The defendant is permitted, for the purpose of effecting such redemption, to maintain a sinking fund by annually setting aside three per cent. of the par value of the stock outstanding. No such fund was created. If the defendant had established such fund, the aggregate thereof would now be $1,051,000. Complainant is the owner of one hundred shares of the common stock of the company. The certificate, dated November 5th, 1928, is in the name of Gruntal, Lilienthal Company. A transfer thereof, with name of transferee in blank, is dated November 7th, 1928. The proofs do not disclose when complainant acquired said certificate. Max Ritter, a holder of fifty shares of common stock, evidenced by a certificate in his name bearing date October 14th, 1929, and Ethel Roth, a holder of a certificate representing one hundred shares of common stock, dated June 19th, 1929, which is in the name of Moyse Holmes, upon which is endorsed a transfer dated June 21st, 1929, with the name of transferee in blank, were granted leave to intervene as parties complainant. Counsel for the defendant stressed in argument that complainant and intervenors represented only three hundred and fifty shares of common stock. No prescribed number of shares is required by law to warrant a stockholder to sue. Section 65 of the Corporation act, as amended by chapter 300 of the laws of 1912, was analyzed by Chancellor Walker in Bull v.International Power Co., 84 N.J. Eq. 209. It authorizes any *Page 548 
stockholder to apply to the court for relief such as sought herein. The legislative wisdom manifested by such enactment cannot be questioned by counsel or the court. It has been repeatedly held by our courts that where a creditor or stockholder comes into court under section 65 of the Corporation act it is not his particular grievance the court is to redress, or his individual interest that is to be protected; but the very object of the act is to protect the public at large from imposition, and to promote and secure the general interest of the stockholders and creditors. See Rawnsley et al. v. TrentonMutual Life Insurance Co., 9 N.J. Eq. 95; Naspo v. SummitSweets Shoppe, Inc., 106 N.J. Eq. 49. The case of Glaser v.Achtel-Stetter's Restaurant, Inc., 106 N.J. Eq. 150, frequently referred to by counsel in receivership cases, and referred to in argument by counsel for defendant herein, is not applicable to the case sub judice except in so far as it holds that the appointment of a receiver is not a matter of absolute legal right and therefore sound discretion should be exercised by the court before any such appointment is made, and in so holding it only states the well-established principle of our law. The defendant is engaged in the business of manufacturing and selling pneumatic and solid automobile tires and tubes. It maintains its manufacturing plant at Cumberland, Maryland. It sells its products directly, through branches, and through dealers and dealer organizations in various states of the United States. It is said to be the sixth largest tire manufacturing company in the United States. It has upwards of eight thousand stockholders, and upwards of three thousand employes. The affidavit of defendant's president recites that for a long period of time the rubber industry as a whole has suffered adverse conditions of a most extremely acute nature, and that the prices of rubber and cotton, important factors in the manufacture of tires, have persistently moved downward for the past five years, thereby tending to unsettle and make uncertain conditions in the rubber industry. Such statement is somewhat corroborative of the affidavit of Israel H. Albert, submitted in behalf of the complainants, who for the past *Page 549 
fifteen years has been engaged in the business of buying, selling and erecting plants and factories for the manufacture of automobile rubber tires, who for many years was engaged in the business of manufacturing and selling of rubber and rubber commodities, and who is familiar with the processes whereby rubber tires are manufactured, and the various methods of distribution and selling. A photostatic copy of "Standard Trade and Securities" of the issue of Friday, August 15th, 1930, a publication engaged in furnishing reports upon the past, present and probable future conditions of industries and companies, conceded by counsel to be one of the most reliable statistical publication of its kind in the United States, attached to and made part of the Albert affidavit, under the caption automobile tires, rubber goods, c, analyzes the affairs of various rubber concerns mentioned therein which are divided into three classes — group A, called "Strongest Position;" group B, called "Weakest Position," and group C, called "Indeterminate Position." The defendant is classified in group B. It reads, inter alia:
"Considered purely in its near term aspects the outlook for the tire trade offers little basis for optimism." And referring to the year 1930 it reads: "There is no reason to believe that the index of tire production from August to December will hold up as well in comparison with last year's monthly levels as that of total industrial production. Assuming, in other words, that general industrial activities will begin to reflect improvement this fall, it now seems probable that rubber manufacturing will continue to be a laggard group, postponing at least until 1931 any sizable recovery." Commenting upon what is indexed as "disappointing demand for casing replacement goods, c.," it reads: "The total tire sales for 1930 are not indicated at much above sixty million against approximately seventy-one million in 1929. Through combination of a practically profitless first six months with a second half year which does not hold out prospects of any substantial earnings improvement, it now seems likely that 1930 will be one of the most distressing years thus far experienced by the rubber industry. Only two or three of the *Page 550 
most strongly situated manufacturers promise to report any net profit. As for the weaker concerns, it is questionable whether some of them can long postpone receivership." The quotation aforesaid is particularly significant in view of the contention of the defendant that it has bright hopes for the future. The peak of the defendant's sales for the year 1929 was in the month of July. The sales slightly decreased in the month of August. The decrease in sales for the months of September, October, November and December were very appreciable, about one-half of the July sales. The defendant's losses for the six months period ending June, 1930, amounted to $587,610. In the affidavit of the president of the defendant it is said that the business for the months of July and August, 1930, has been satisfactory in that profit estimated as approximately $135,000 for each of said months was realized. Such conjectural statement cannot be regarded as proof that the defendant at the end of the year 1930 will be in any better state than it was at the end of the year 1929. On September 24th, 1929, the president of the defendant in response to a letter of complaint addressed to him by Joseph B. Mayer, a stockholder owning one thousand shares of common stock and one thousand shares of preferred stock, stated that the company had earned approximately $194,007 for the first seven months of that year. The annual report issued by the defendant to its stockholders as of December 31st, 1929, showed a net loss from operations for the year of $1,346,417.90. If the loss of inventory, bad debts, c., as calculated at the end of the year was pro-rated monthly, the result would be a considerable loss for such months rather than the profit earned as stated by the president. If prognostication for the latter five months of the year 1930 is to be based upon the results obtained for the latter five months of the year 1929, a much greater loss may reasonably be anticipated for the year 1930 than was suffered by the defendant in the year 1929. The report of the auditor designated by the court to examine certain statements presented at the hearing in behalf of the defendant shows in schedule "A" thereof the net loss to the company *Page 551 
for the first seven months of the year 1930 to be $450,915.47 — as compared with the above-stated alleged profit of $194,007 for the same period in the year 1929. The loss of $587,610 reported by the defendant for the first six months of the year 1930 does not include items of loss of inventory, bad debts, c., which will have to be calculated. Such items at the close of the year 1929 amounted to $650,191.17. It may reasonably be deduced from the proofs herein relating to the production, manufacture and sales of the automobile tire industry that the same if not greater loss in inventory, bad debts, c., will be shown by the annual report of operations of the defendant for the year 1930. It was argued in defendant's behalf that the great loss sustained in the year 1929 was due to the financial and business depression generally prevailing during the latter part of said year, but it seems to me puerile to so contend in view of the fact clearly manifested by the proofs herein that the defendant suffered even greater losses in preceding years when no such depression prevailed. For instance, in the year 1923 it suffered a loss of $1,166,284.34, in addition to which it declared dividends on its preferred stock amounting to $602,276, thereby depleting the assets during that year to the extent of $1,768,560. In the year 1924 it suffered a loss of $1,525,749, in addition to which it declared dividends on its preferred stock for the first quarter amounting to $149,544, thereby depleting the assets during that year to the extent of $1,655,293. In the year 1926 it suffered a loss of $3,439,800. In the year 1928 it suffered a loss of $2,490,513. In the year 1928 it sold seven hundred thousand shares of common stock, from which it realized a sum of approximately $14,000,000, a very considerable part of which was used in payment of its outstanding debentures, debts due to banks, c., which relieved it of interest payments of a considerable sum. If such outstanding obligations were not paid the defendant would have been obliged to include very large additional sums, for interest, in its statement of loss for that year and subsequent years. The loss sustained by the defendant from business operations for the period January 1st, 1923, to June 30th, 1930, was *Page 552 
$10,556,373. The defendant made a profit from business operations in the year 1925 of $1,452,577, and in the year 1927, $357,741. The net loss from business operations for the aforesaid period was $8,746,055. In addition thereto accumulated dividends on preferred stock of $3,840,000 payable from the year 1924 have not been paid. Such accumulated dividends would have to be earned and paid to the preferred stockholders before any moneys may be paid as dividends on common stock. To meet the annual requirements of dividends on preferred stock the sum of $600,000 per year net would have to be earned by the defendant. It appears from schedules "A" and "B," attached to the report of the accountant designated by the court herein that the sales of the defendant would have to aggregate $2,300,000 per month to produce a net profit to the company. A prospect of such amount of sales in the near future, in view of actual experiences of the past, would have to be regarded as fanciful — not real. The condition which brings about such a result appears to be occasioned chiefly by the vast fixed overhead expense of the defendant. Counsel for the defendant disputes such statement, and in view thereof I am constrained to disregard the report of the auditor in such respect, and give the defendant the benefit of doubt. Counsel for the defendant urged that notwithstanding the great losses sustained by the defendant the case sub judice is comparable to the case of Fox v. Pathe Exchange, 106 N.J. Eq. 522, and should be adjudged thereby. I do not regard such to be the fact. The cases are clearly distinguishable. Optimism for a betterment of the operating affairs of the defendant in the near future cannot, in my judgment, be predicated upon the proofs herein and the world-wide knowledge of the extremely poor and continuously declining business conditions in the rubber and cotton industries. Affidavits of officers of the defendant manifest their optimism for betterment of the operating affairs of the defendant in the near future, and indicate that as a result of economies and reductions planned and effected by budget and executive committees a saving will result for the year 1930 over the year 1929 of $768,000. *Page 553 
The items which go to make such amount are stated as follows: Reduction on fixed selling expenses, $364,000; reduction in administration expenses, $104,000; reduction in advertising expenses, $300,000. To this may be added non-payment of bonuses for the year 1930, an inexcusable and reprehensible outlay in the face of great losses suffered by defendant. The affidavits aforesaid show also that because of the continuance of the severe business depression of the first six months of 1930, together with the fact that sales during the first three months of any year are fifty per cent. below normal in the tire business, the economies and reductions so planned and effected have thus far operated only to reduce losses, but that beginning June 15th, 1930, and continuing to this time, the effect of such economies and reductions upon the business of the defendant was apparent as producing in part the earnings which accrued to the defendant during the months of July and August, and also part of September, with increased sales. The chief accountant of the defendant in his affidavit says that the fixed selling, administration and advertising expenses of the defendant for the first six months ending June 30th, 1930, have decreased $432,498. He states that the increase of defendant's total casing sales for July, 1930, over June, 1930, is twenty-six per cent., whereas the figures of the tire industry as a whole just officially published in the Wall Street Journal of September 13th, 1930, show that the increase of casing sales for July amounted to only three per cent. He also says that the increase of the defendant's casing sales to dealers for July, 1930, over June, 1930, is thirty-five per cent. as against fourteen per cent. for the tire industry as a whole. His affidavit manifests that he is sanguine of a favorable outlook for defendant's business in the near future and of the probability of defendant making more than normal profits with betterment of general business conditions, as a result of the economies and reductions mentioned, and other favorable factors upon which defendant relies. The defendant's proofs show that the losses it sustained are no greater, and in many instances less, than the losses sustained by other tire manufacturers within the past few years. Counsel for *Page 554 
the defendant stressed in argument the defendant's strong financial condition, pointing to the fact that it had upwards of $19,000,000 of readily available liquid assets, exclusive of other assets, which, he urged, would enable it to absorb such losses as it may sustain as a result of business operations for the year 1930 without seriously imperiling the rights of stockholders, the safety of the public, and the defendant's future prospects. I am in accord therewith, but deem it advisable to say that if the business operations of the defendant do not improve in the year 1931, it cannot be reasonably urged that the defendant be permitted to continue from year to year to sustain losses which it has sustained for several years past. Notwithstanding the losses sustained, as demonstrated hereinabove, I am constrained to regard the proof as to the present earnings of the company, and of the economies and reductions planned and effected, as credible. No proofs have been established herein to show that the officers and directors of the defendant are not capable. The proofs indicate that they are striving to the best of their ability to advance the business interest of the defendant so as to bring beneficial results to the stockholders. Section 12 of the Corporation act provides that the business of every corporation shall be managed by its directors. The authority of the directors in the conduct of the business of a corporation must be regarded as absolute when they act within the law. It is a well-known rule of law that questions of policy of management are left solely to the honest decision of officers and directors of a corporation. Ellerman v. ChicagoJunction Railways and Union Stockyards Co., 49 N.J. Eq. 217;Elevator Supplies Co. v. Wylde, 106 N.J. Eq. 163. The court is without authority to substitute its judgment for the judgment of the board of directors. Whether the business of a corporation should be operated at a loss during a business depression or close down at a smaller loss, is a purely business and economical problem to be determined by the directors of the corporation and not by the court. Farmers Loan and Trust Co. v. Hewitt,94 N.J. Eq. 65; affirmed, Ibid. 187. It is urged in behalf of complainants that the *Page 555 
aforesaid rule of law cannot be applied to the case sub judice
because the great losses sustained by the defendant of which they complain are such as were sustained throughout a period of years during which there was no business depression. I deem it applicable by way of analogy. The proofs disclose that the defendant is free from judgments or other liens under which it may be sold speedily at sacrifice sales. I have in mind in my consideration of this case the cautionary words of Judge Baldwin, quoted in the oft-cited case of Citizens Coach Co. v. CamdenHorse Railroad Co., 29 N.J. Eq. 299 (at p. 303): "There is no power, the exercise of which is more delicate, which requires greater caution, deliberation and sound discretion, and which is more dangerous in a doubtful case than the issuing of an injunction." A fortiori the appointment of a receiver. Theextraordinary powers conferred upon this court by section 65 of the Corporation act should be exercised with caution, and only when the circumstances of the case and the ends of justice require it. Such appears to be the admonition of our courts as indicated by numerous authorities, of which I deem it necessary to cite only Oakley v. Paterson Bank, 2 N.J. Eq. 173 (at pp.178, 179); Brundred v. Paterson Machine Co., 4 N.J. Eq. 294
(at p. 305); Rawnsley v. Trenton Mutual Life Insurance Co.,9 N.J. Eq. 347; Atlantic Trust Co. v. Consolidated ElectricStorage Co., 49 N.J. Eq. 402, 406, 407; New Foundland RailwayConstruction Co. v. Schack, 40 N.J. Eq. 222; Cook v. EastTrenton Pottery Co., 53 N.J. Eq. 29; Greenbaum v. Lafayette andBroad Realty Corp., 96 N.J. Eq. 317 (at p. 319). I have also in mind the great harm that may result to a business corporation, and in the instant case to the defendant, from an unwarranted appointment of a receiver therefor. In Brundred v. PatersonMachine Co., supra, although the court granted an injunction and appointed a receiver it said: "If it be a balancing question, and the course of those who manage its affairs appears to be upright and just, the doubt should be resolved in favor of the rights of the company. It would be unwise, and against public policy, to seek an occasion for interference with any *Page 556 
corporation, so long as they are striving against adversity with an honest purpose, unless their case is hopeless, or their course of action so unfair as to jeopardize the interests of creditors and the public." The case of Atlantic Trust Co. v.Consolidated Electric Storage Co., supra, is an oft-cited authority for the proposition that where insolvency is proved, but it is also made to appear that the managers of the corporation are honest and capable, and that they are striving to the best of their ability, with a fair prospect of success, to relieve it from its embarrassment and put it in a condition where it may carry on its business successfully, and its property is free from judgment or other lien under which it may be speedily sold, at a sacrifice, the court should not interfere. InGreenbaum v. Lafayette and Broad Realty Corp., supra, our court of errors and appeals declared: "Depriving a statutory legal business entity of its corporate life, is a judicial act which should not be lightly exercised, since the intervention of the court carries with it very often in practical execution not only the destruction of the livelihood of those who subsist by its existence, but also the investments of those who have confidently contributed their means to its successful creation, and, finally, but not at all the least of its unfortunate results, such an interposition may be the means of removing from the field of honest successful endeavor, a business asset of substance and importance to the well-being of the state." I am limited in my consideration of the matter sub judice to the amendment of section 65 of our Corporation act as enacted by chapter 300 of the laws of 1912. I am actuated in so stating because counsel for the defendant, basing his argument on the affidavit of the president of the defendant, urged that the total net worth of the defendant as of June 30th, 1930, as shown by its balance sheet, was $19,056,585.97, and that it had current assets as of said date of $13,460,748.20 against all liabilities which were said to be $2,314,915.02, or a ratio of five and three-fourths to one. I stated to counsel that the insolvency of the defendant was not in question herein and such is the fact. Admitting the solvency of the defendant at the present *Page 557 
time it may readily be appreciated that if it continued in future to suffer the loss of millions of dollars as in the past few years it would not be long before the assets of the company would be entirely dissipated and the value of the stockholders' shares be nil. Counsel for the defendant stated in argument that no stockholder of the company had complained of the conduct of the defendant's business prior to the present suit. Apparently he had not been advised with respect thereto. The proofs show that in September, 1929, Joseph B. Mayer, a stockholder owning one thousand shares of preferred stock and one thousand shares of common stock, which he had acquired a considerable time prior thereto, complained of the business operations of the defendant. The letters which passed between Mr. Mayer and the president of the defendant were placed in evidence, and also some letters which passed between the president of the defendant and the attorneys for Mr. Mayer. In a letter of October 10th, 1929, addressed by Mr. Mayer to Mr. Samuel Woolner, Jr., president of the defendant, he says: "I think it would be to the advantage of all concerned if a merger could be arranged with some profitable concern. If not, I should think liquidation would be the most profitable thing to do. To-day, the stockholders would get something, but one cannot tell what they will get five years hence, if the profits do not increase." To grant to the complainants the relief sought herein three statutory requisites must be clearly established — (1) that the defendant's businesshas been conducted at a great loss and greatly prejudicial to the interest of its creditors or stockholders; (2) that the defendant's business is being so conducted; and (3) that the defendant's business cannot be conducted with safety to the public and advantage to the stockholders. Such statutory requisites must be clearly manifest in order to confer jurisdiction upon the court. From the proofs herein I find the first requisite to have been substantiated. The second and third requisites I find have not been substantiated. Therefore, the relief sought by the complainants must be denied, and the bill of complaint and order to show cause thereon dismissed. I will advise a decree accordingly. *Page 558 
I deem it advisable to add supplemental to what I have stated hereinabove, that subsequent to the final hearing herein counsel for the respective parties appeared before the court and expressed their agreement that the bill of complaint and order to show cause thereon be dismissed. I stated to counsel that while I was mindful of the general rule of law which permitted litigants ordinarily to discontinue their litigation at any time prior to the entry of judgment by the court, nevertheless, in the instant case, the state was a party in interest because of the rights of the public at large which the legislature under section 65 of the Corporation act endeavored to safeguard. I stated also that I could conceive of no reasonable objection to their expressing their request for a dismissal of the suit particularly inasmuch as I contemplated dismissing the bill on the merits of the cause. Counsel for the complainants stated to the court that they realized they had not established proof sufficient to warrant the court to grant the relief prayed by complainants. Considerable matters were stated to the court by counsel for the respective parties, all of which appear in the record of the case, which doubtless actuated counsel for the complainants to manifest their willingness to have the court dismiss complainant's bill, and the order to show cause issued thereon. It appears to me that while from the face of the bill of complaint, the complainant, Kelly, may be regarded as warranted to institute the instant suit for the purpose of affording the parties in interest an opportunity to have the merit of the suit inquired into, nevertheless, the revelations made known to the court by counsel as to activities subsequent to the filing of the bill might well be regarded as unethical, if not in fact reprehensible. *Page 559