The defendant, The Kelly-Springfield Tire Company, is a corporation organized October 29th, 1932, under the laws of the State of New Jersey. It was formed by consolidation of Kelly-Springfield Tire Company, a corporation organized on April 15th, 1899, under the laws of the State of New Jersey, and Kelspring Corporation, a corporation organized in 1932 under the laws of the State of New Jersey. The defendant company is engaged principally in the business of manufacturing and selling automobile, motor truck and carriage tires, and rubber products.
The complainant Ernst Garr is the owner of $5,000 principal amount of the ten-year six per cent. notes of The Kelly-Springfield Tire Company, which notes are by the terms of the note agreement under which they are issued, subordinate both as to principal and interest to all bank loans and all other indebtedness of, or assumed by, the company, present or future, with certain exceptions enumerated in said note agreement. The complainants John Balfour Horne and Walter Wyon Ward, constituting a protective committee for foreign holders of the ten-year six per cent. notes of The Kelly-Springfield Tire Company are, as such committee, the holders of $417,400 principal amount of the said ten-year six per cent. notes. The complainants have instituted this suit on their own behalf and for and on the behalf of all others similarly situated.
The complainants allege that from 1923 to 1929, inclusive, "the company recorded losses in all years except 1925 and 1927, with total losses for the period of approximately $8,000,000," as follows:
 1923 .................................... $1,166,284
 1924 .................................... 1,525,749
 1925 Profit ............................. 1,452,577
 1926 .................................... 3,439,800
 1927 Profit ............................. 357,741
 1928 .................................... 2,490,513
 1929 .................................... 1,346,417

The complainants say that the profit for the year 1925 arose through the low cost of rubber in January of that *Page 354 
year and the increase in the same in the month of December of that year. But the defendant denies this. The average import price of India rubber that year was $.304 per pound and in December following it was $.72 per pound.
The bill and affidavits charge that the business of the defendant company and its predecessory company has been and is being conducted at a great loss; that the annual report of the company and its predecessor company for the years 1930, 1931, 1932 and 1933, and the semi-annual report of June 30th, 1934, and the letter of the stockholders protective committee dated October 19th, 1934, and also the letter of the stockholders protective committee dated November 5th, 1934, all of which are exhibits, indicate the following losses:
 1930 .................................... $3,796,054.41
 1931 .................................... 468,334.43
 1932 .................................... 666,313.47
 1933 .................................... 961,998.74
 First 6 months of 1934 .................. 553,660.96
 July, 1934 .............................. 44,767.00
 August, 1934 ............................ 56,087.00
 September, 1934 ......................... 129,722.00

The net worth of the company and its predecessor company, as shown by the annual reports of the company, since December, 1928, is as follows:
December 31, 1928 ........................................ $30,725,112.95
December 31, 1929 ........................................ 26,644,627.26
 (Not allowing for certain contingent liabilities
 and for unpaid dividends on preferred stock.)
December 31, 1930 ........................................ 22,848,572.85
 (Again not allowing for certain contingent liabilities
 and for unpaid dividends on preferred stock.)
December 31, 1931 ........................................ 22,333,941.78
 (Again not allowing for certain contingent liabilities
 and for unpaid dividends on preferred stock.)
December 31, 1932 ........................................ 11,144.027.66
 (Not allowing for certain contingent liabilities as
 guarantor.)
 *Page 355 
December 31, 1933 ........................................ 10,183,276.61
 (Not allowing for contingent liability as guarantor
 in the sum of $105,018.99, or for cumulative
 dividends on preference stock unpaid since January
 1, 1933.)
June 30, 1934 ............................................ 9,629,615.65

And during the said period the excess of current assets over current liabilities has been as follows:
 December 31, 1928 ............................ $15,801,064
 1929 ............................ 11,500,535
 1930 ............................ 8,613,820
 1931 ............................ 8,153,049
 1932 ............................ 7,004,024
 1933 ............................ 6,221,598
 June 30, 1934 ............................ 5,640,644

The excess of current assets over current liabilities from 1923 to 1927, inclusive, was as follows:
 December 31, 1923 ............................ $11,009,152
 1924 ............................ 9,278,014
 1925 ............................ 10,593,023
 1926 ............................ 5,604,057
 1927 ............................ 4,730,799

In 1928 the company was unable to refund its gold notes in the principal sum of $4,500,000 and liquidate its bank indebtedness in the amount of approximately $7,000,000; and it is alleged that its working capital was materially depleted. On October 13th, 1928, a plan was approved by the stockholders and subsequently carried into effect whereby the then common stock was changed from a par value of $25 per share to no par value; and the authorized common stock was increased to one million two hundred thousand shares without par value; seven hundred thousand shares of the newly authorized common stock were sold at $21 per share. This sale provided the company with approximately $14,000,000 additional cash. Part of it was used for the retirement of $4,500,000 of ten-year eight per cent. notes then outstanding, and approximately $7,000,000 of it was used to liquidate bank indebtedness. *Page 356 
The position of the company about December 31st, 1928, was as follows:
 10-year 8% sinking fund gold notes, redeemable in
 semi-annual installments from May 15, 1923, to May
 15, 1931 (outstanding and including premiums payable
 on redemption) ....................................... $3,543,870.00
 6% cumulative preferred stock, par value $100
 (outstanding) ........................................ 2,950,000.00
 8% cumulative preferred stock, par value $100
 (outstanding) ........................................ 5,264,700.00
 Common stock without par value (1,063,840.11 shares
 outstanding) carried on the books at ................. 23,796,002.75

In 1930 a bill was filed in this court by James A. Kelly seeking the appointment of a receiver for the predecessor company under section 65 of the General Corporation act. Vice-Chancellor Fallon, at that time, advised a decree dismissing the bill. His opinion is reported in Kelly v. Kelly-Springfield Tire Co.,106 N.J. Eq. 545. Among other things, he said:
"The annual report issued by the defendant to its stockholders as of December 31st, 1929, showed a net loss from operations for the year of $1,346,417.90. If the loss of inventory, bad debts,c., as calculated at the end of the year was pro rated monthly, the result would be a considerable loss for such months rather than the profit earned as stated by the president. If prognostication for the latter five months of the year 1930 is to be based upon the results obtained for the latter five months of the year 1929, a much greater loss may reasonably be anticipated for the year 1930 than was suffered by the defendant in the year 1929. The report of the auditor designated by the court to examine certain statements presented at the hearing in behalf of the defendant shows in schedule `A' thereof the net loss to the company for the first seven months of the year 1930 to be $450,915.47 — as compared with the above stated alleged profit of $194,007 for the same period in the year 1929. The loss of $587,610 reported by the defendant for the first six months of the year 1930 does not include items of loss of inventory, bad debts, c., which will have to be calculated. *Page 357 
Such items at the close of the year 1929 amounted to $650,191.17. It may reasonably be deduced from the proofs herein relating to the production, manufacture and sales of the automobile tire industry that the same if not greater loss in inventory, bad debts, c., will be shown by the annual report of operations of the defendant for the year 1930. It was argued in defendant's behalf that the great loss sustained in the year 1929 was due to the financial and business depression generally prevailing during the latter part of said year, but it seems to me puerile to so contend in view of the fact clearly manifested by the proofs herein that the defendant suffered even greater losses in preceding years when no such depression prevailed. For instance, in the year 1923 it suffered a loss of $1,166,284.34, in addition to which it declared dividends on its preferred stock amounting to $602,276, thereby depleting the assets during that year to the extent of $1,768,560. In the year 1924 it suffered a loss of $1,525,749, in addition to which it declared dividends on its preferred stock for the first quarter amounting to $149,544, thereby depleting the assets during that year to the extent of $1,655,293. In the year 1926 it suffered a loss of $3,439,800. In the year 1928 it suffered a loss of $2,490,513. In the year 1928 it sold seven hundred thousand shares of common stock, from which it realized a sum of approximately $14,000,000, a very considerable part of which was used in payment of its outstanding debentures, debts due to banks, c., which relieved it of interest payments of a considerable sum. If such outstanding obligations were not paid the defendant would have been obliged to include very large additional sums, for interest, in its statement of loss for that year and subsequent years. The loss sustained by the defendant from business operations for the period January 1st, 1923, to June 30th, 1930, was $10,556,373. The defendant made a profit from business operations in the year 1925 of $1,452,577, and in the year 1927, $357,741. The net loss from business operations for the aforesaid period was $8,746,055. In addition thereto accumulated dividends on preferred stock of $3,840,000 payable from the year 1924 *Page 358 
have not been paid. Such accumulated dividends would have to be earned and paid to the preferred stockholders before any moneys may be paid as dividends on common stock. To meet the annual requirements of dividends on preferred stock the sum of $600,000 per year net would have to be earned by the defendant. It appears from schedules `A' and `B,' attached to the report of the accountant designated by the court herein that the sales of the defendant would have to aggregate $2,300,000 per month to produce a net profit to the company. A prospect of such amount of sales in the near future, in view of actual experiences of the past, would have to be regarded as fanciful — not real."
And, he further stated on page 554: "If the business operations of the defendant do not improve in the year 1931, it cannot be reasonably urged that the defendant be permitted to continue from year to year to sustain losses which it has sustained for several years past."
In the year 1932 the predecessor company underwent a further capital readjustment, having for its purpose the elimination of accrued dividends and the accrued sinking fund obligations on both its then classes of preferred stock and the creation of a surplus and the elimination from the balance sheet of the asset item of patent rights. Under this last capital readjustment the present company was formed. Under the readjustment the securities of the predecessor company were exchanged for those of the present company on the following basis:
1 share of 6% cumulative preferred stock, par value $100, outstanding $2,950,000, of the predecessor company, for $100 principal amount of 10-year 6% subordinate notes of the present company, plus 2 shares of the $5 par value common stock of the present company;
1 share of 8% preferred stock, par value $100, outstanding $5,264,700, of the predecessor company, for 1 share of $6 cumulative preference stock, without par value, of the present company, entitled to $100, together with cumulative dividends on liquidation, plus 3 shares of the $5 par value common stock of the present company;
1 share of no par value common stock, outstanding 1,063,840 shares, of the predecessor company, for 1/2 share of the $5 par value common stock of the present company. *Page 359 
As of June 30th, 1934, the company stock capitalized was as follows:
 10-year 6% subordinate notes (net) ..................... $2,611,500.00
 49,952 shares $6 preference stock no par, entitled on
 liquidation to $100 per share plus dividends accrued
 since January 1, 1933, stated value .................. 4,995,200.00
 741,206 shares of common stock, $5 par value ........... 3,706,030.00

The present management of the company, and of the predecessor company, assumed control in the month of March, 1931. The change of management, it is alleged, took place because of poor operating results occurring over a period of years. Some time in the early part of this year a stockholders protective committee was formed, having for its object a change in the management of the company. That committee asked to intervene in these proceedings and its request was granted. This committee has been waging a vigorous campaign of opposition to the present management; it has circularized the stockholders with bitter attacks and criticisms of the conduct of the management. The corporation, either because of the campaign being pursued by the stockholders protective committee, or through business wisdom, engaged an outstanding engineering firm, Ford, Bacon Davis, Incorporated, to conduct an investigation into the affairs of the company. Its report dated September 26th, 1934, contains this observation: "The present fight for control of the company has disrupted the morale of the company's agents and employes and has aggravated its serious condition."
Complainants' exhibit "E" is a circular issued by the stockholders protective committee, showing the earnings of other comparable companies in the same industry for the years 1933 and 1934; their net profits appear on it as follows:
 Net Profits Net Profits
 Year 1933 1st 6 mos. 1934
Goodyear Tire Rubber Co. ......... $6,021,535 $2,617,197
Firestone Tire Rubber Co. ........ 2,397,060 1,521,745*
U.S. Rubber Co. .................... 76,913 26,588
Goodrich Tire Rubber Co. ......... 2,272,514 1,486,956
Lee Tire Rubber Co. .............. 260,607 128,510*
 *Page 360 
Norwalk Tire Rubber Co. .......... 73,556 .......
General Tire Rubber Co. .......... 414,913 .......
Fisk Rubber Co. (new company) ...... ....... 372,768
* Figures for 6 months ended April 30, 1934.

Various reasons have been stated for the company's losses. Some of them being that the "price declines in raw rubber and cotton forced large inventory write-offs." Managements have been criticised and changes in them were effected. The 1933 losses are alleged to be "the result of contracts entered into in the middle of that year at the height of a severe price war." It is alleged that the raw material commitments of the company on December 31st, 1933, were valued much below market prices, but notwithstanding, losses continued. The reasons urged for the losses appear to me to be without force when the profitable returns of the other companies herein mentioned are considered. Those companies were confronted with practically the same business conditions and yet they succeeded in producing profits. It is charged that the company's method of distribution is antiquated and inefficient; and that the company is without the capital to remedy it. The company's products are distributed through independent dealers. That method of distribution is now criticised as not being up-to-date and it is no longer recognized as efficient. The modern method of distribution used by the company's competitors is largely, if not altogether, through company-owned stores; through service stations of leading oil companies; and through mail order houses. The defendant company admittedly is unable to avail itself of these present day methods of distribution because it has not the necessary capital to effect the change. It is alleged that the company has lost forty-one per cent. of its dealer accounts between June, 1933, and June, 1934, and there is a feeling that unless it extends unwise credits it will continue to lose more accounts. It appears that the company is unable to operate its plant at capacity due to lack of distribution. The report of the company's engineers, Ford, Bacon Davis, Incorporated, shows that the company is operating at approximately twenty per cent. to twenty-five per cent. of the capacity. *Page 361 
The tire business is marked by frequent price wars. The defendant company appreciates their injurious effects and admits it cannot withstand them as well as its larger competitors who have strong financial resources. It is contended that these price wars will seriously affect the company's existence if its financial condition continues to weaken — and there is considerable force in this contention.
Exhibit "F" in effect says another contributing reason to the losses of the company is its lack of supply of low-cost rubber. The company purchases its rubber in open market where the prices have advanced from a low of approximately $.03 early in 1933 to approximately $.16 in the summer of 1934; the present price being approximately $.13. The company's competitors, with their strong financial resources, have and will, for some time to come, have on hand supplies of rubber purchased at $.06 to $.08 per pound. It is alleged the same situation prevails in regard to the company's cotton supplies.
It is also urged that the company's labor costs are higher than those of its competitors. It is estimated the company faces a loss of approximately $1,000,000 per year. Its cash as of June 30th, 1934, amounted to $901,054.97. It is alleged that the attitude of the banks is generally unfavorable to the granting of loans to companies which are operating at a loss, particularly so in the face of stockholders' dissension. That allegation the defendants do not dispute and in effect admit.
The said report of Ford, Bacon Davis, Incorporated, states:
"The immediate problem which the company faces is whether or not it can stand for losses which confront it without seriously impairing its working capital position before conditions in the industry are stabilized and it becomes possible to operate at a profit;" and "it must be expected that operating losses will continue to be shown until such time as tire prices become stabilized and/or reflect the then current price of rubber." *Page 362 
Sales of the company's securities on the New York stock exchange on November 5th, 1934, are quoted as follows:
Notes of the company $36 for each $100 note; six per cent. cumulative preference stock for $7.25 per share; common stock for $1.50 per share.
The company's answer and affidavits practically admit the main allegations of the bill of complaint. It denies that the sum used to retire the bank indebtedness was only $7,000,000, and charges that it was $10,000,000. It admits the capital readjustment plan of the year 1932, as alleged in the bill of complaint. It admits the allegations of the complainants that the stockholders protective committee was organized in February, 1934, and alleges that the same committee organized a new committee in the month of August, 1934, and that they are campaigning for a new management for the company and that the "said campaign has resulted in widespread agitation and disturbance among the stockholders of the defendant, its customers, dealers and the public generally in connection with the affairs of the company, and has aggravated the difficulties with which the management is contending." It says that the long decline in commodity prices during the past five years caused it to suffer heavy losses, and that it has also suffered heavy losses in inventory values; that its principal market is through independent dealers in tires supplying the public demand and market for "replacement tires;" that it has little or no equipment business, and that it is unable, owing to lack of sufficient capital, to establish its own stores, or distributing agencies; and it admits that it has been unable to obtain important selling contracts with any of the leading oil companies or leading mail order houses, owing partly to lack of working capital, and owing "to the lack of confidence in the stability and continuity of the management of the company on account of internal dissension."
It admits that it lost a portion of its dealer accounts since June, 1933, but alleges that it has acquired a number of satisfactory new dealer accounts; it admits that there have been frequent price wars in the tire industry, and other *Page 363 
destructive trade practices, which have seriously affected its business; it admits that it has little of its so-called "low cost rubber" left on hand; it admits "that its losses for the year 1934 are estimated at approximately $1,000,000, and that losses must reasonably be expected for the early months of the year 1935;" it admits the correctness of the New York stock market quotations as alleged in the complaint.
The defendant alleges that the notes held by the complainants, by their terms, are subject to the provisions of a note agreement, attached to the bill of complaint and marked Exhibit"U;" that no completed default, as defined in said note agreement, has occurred, or is threatened; that the notes are not due and that all interest thereon due to date, and all required sinking fund payments have been paid; that the complainants have not complied with any of the requirements of the said provisions as a condition precedent to the bringing of "this proceeding" for the appointment of a receiver.
It alleges that it is not insolvent; that it has not failed to pay its debts in the ordinary course of business and that as of October 31st, 1934, it had on hand in its treasury over $1,000,000 in cash, and that the value of its inventories, accounts receivable and other current assets as carried on its books and accounts was at that date approximately $5,000,000, exclusive of said cash; that its quick assets are of a book value of more than twelve times its current liabilities; that it has no obligations or liabilities other than its current accounts payable and accruals amounting to approximately $491,759, its ten-year six per cent. subordinate notes in the total principal amount of $2,611,500, and certain contingent liabilities small in amount; that it has no bank loans; that its properties are not encumbered by any mortgages.
Article 5 of the note agreement is entitled "Remedies of Trustee and Registered Noteholders Upon Default." Section 4 of said article 5 provides:
"No holder of any note shall have any right to institute any suit, action or proceeding, in equity or at law for the execution of any trust hereunder or for the appointment of a receiver or for any other remedy hereunder, or to enforce notes." *Page 364 
One of the conditions contained in the said restrictive provision of said article 5 is that "such holders previously shall have given to the trustee written notice of a completed default." The complainants admit they have not complied with the conditions enumerated, and assert that the provision does not apply to this suit. They contend the restrictive provisions of the note agreement have no application to the rights of noteholders before default. Complainant argues that "if the restrictive provision applies to the rights of a noteholder before default, the noteholder would have no rights before default because the default is one of the conditions enumerated in the restrictive provision. There is no statement in the agreement that noteholders shall have no rights before default." Counsel for the company and counsel for the stockholders committee argued that it was the intent to deprive the noteholders of any remedy of any kind, nature or description, prior to default. Their contention in effect amounts to this: If the noteholders saw the assets of the corporation being dissipated they would be without the right to seek relief if the company could raise moneys to pay the interest on the notes; and the moneys so borrowed would have priority over their notes, and the assets of the company could be reduced to an amount that would be insufficient in book value to pay the notes. The restrictive provisions are to be strictly construed. Reinhardt
v. Inter-State Telephone Co., 71 N.J. Eq. 70. The noteholders are creditors and as such they have rights which the courts will protect and maintain. Reinhardt v. Inter-State Telephone Co.,supra. It is my feeling that the complainants are absolutely within their rights in initiating these proceedings and seeking relief in this court, even though there be no default. Jennings
v. Studebaker Corp., 112 N.J. Eq. 591; Tachna v. Pressed SteelCar Co., Ibid. 174 (reversed on other grounds), Ibid. 411.
The affidavits filed by the defendant company and by the intervening stockholders committee, clearly indicate that the company is suffering from fundamental ills that require immediate and strong remedies if it is to survive. "It would *Page 365 
involve substantial expenditures to rearrange the plant to conform to the best practice." (Ford, Bacon Davis report, quoted in paragraph 12, page 3 of Burke's affidavit of November 19th, 1934.)
The affidavit of J.K. Newman, dated November 23d 1934, paragraph 10, page 13, says: "The best way to obtain additional business is by consolidating the Kelly company with one or more other companies which are experiencing the same character of trouble. * * * But such consolidations are impossible when the controversies between the stockholders are so persistent and are given to such wide publicity." And "the company cannot withstand continued conflict between its stockholders, with change after change in the executive personnel and directors." This deponent acquired an interest in the Kelly-Springfield company in the fall of 1928, when, with several associates, he bought several thousand shares of six per cent. preferred stock then outstanding.
The affidavits filed by the company clearly set forth that the dissension among the stockholders is quite serious in consequence of which its credit has been injured and its prospect of financing its ordinary operations will be dangerously affected, and that its losses can be stopped only by drastic changes requiring large amounts of new capital or by consolidation with another company. These remedies cannot be accomplished in face of the stockholders' fight; and the finish of the fight, or the dissension, does not appear to be in sight. Liquidation does not necessarily follow a receivership under section 65 of General Corporation act; reorganization may be effected under it. General Corporation act, sections 86a, 68-70; Jennings v. StudebakerCorp., supra. The object of the act is to protect the public at large from imposition and to promote and secure the general interest of the stockholders and creditors. Kelly v.Kelly-Springfield Tire Co., supra.
The company was given an opportunity by Vice-Chancellor Fallon to effect salutary improvements in management, to make necessary changes in management, and to strengthen its financial position in the proceedings which were instituted *Page 366 
before him. Kelly v. Kelly-Springfield Tire Co., supra.
Despite the accorded "breathing spell" matters went from "bad to worse" and no appreciable change was effected, and no cessation of the losses resulted. How long should this condition be permitted to continue without check? When will it be overcome?
The net worth of the company and its predecessor company on December 31st, 1928, was $30,724,112.95, and on June 10th, 1934, its net worth was $9,629,615.65. Practically twenty millions of dollars has vanished from the assets of the company over a period of six years.
"Admitting the solvency of the defendant at the present time it may readily be appreciated that if it continued in future to suffer the loss of millions of dollars as in the past few years it would not be long before the assets of the company would be entirely dissipated and the value of the stockholders' shares be nil." Kelly v. Kelly-Springfield Tire Co., supra.
After the answer and affidavits were filed, counsel for the company asked the court to suspend judgment for a period of ten days in order to enable him to discuss the company's position with a competitor and, if possible, negotiate a merger of interests. The court granted the request of counsel and approximately ten days thereafter, was informed by him that the negotiations had failed.
Two other counsel representing heavily interested stockholders also sought delay from this court for a like purpose, and also for the purpose of trying to reconcile the warring stockholders of the company. They subsequently announced that their efforts were vain.
The language of Vice-Chancellor Fallon in Kelly v.Kelly-Springfield Tire Co., supra (at p. 552), applies to the instant case:
"Optimism for a betterment of the operating affairs of the defendant in the near future cannot, in my judgment, be predicated upon the proofs herein and the world-wide knowledge of the extremely poor and continuously declining business conditions in the rubber and cotton industries." *Page 367 
Counsel for the complainant put this question to the court:
"How much longer are the holders of these notes required to stand aside and watch the assets, as to which the holders of six per cent. cumulative preferred stock they had prior rights, which would return the full amount of their investments, and which assets now are the only source from which they can expect to be paid the principal and interest of their notes being lost, and to watch contending groups of common stockholders, who have to-day but a very uncertain interest to be protected, so fight about the control and management of the company as to make further great loss inevitable?"
The question is pertinent and my answer is, so far as this court is concerned, the complainants are entitled to and will receive immediate relief. The company's record and history of continued losses warrant consideration without delay. I find that the defendant's business has been conducted at a great loss and greatly prejudicial to the interests of its stockholders and creditors, and it cannot be conducted with safety to the public and advantage to the stockholders.
The extraordinary powers which this court holds under section 65 of the Corporation act should be exercised with caution and only when the circumstances of the case and the ends of justice require it. After viewing the picture of the defendant company's condition presented by both parties to this suit, for the court then to say continue unrestricted with your policy of financial losses and alleged incompetent management, would in effect amount to a denial of justice to the creditors and stockholders, and it would be a detriment to the public.
I shall, accordingly, advise a decree pursuant to the prayer of the bill. *Page 368